[No. 36275. En Banc. January 16, 1964.]

RICHARD E. JONES, *Respondent*, v. JOSEPH HARRIS et al.,
*Appellants.**

*Randall, Danskin, Lundin & Allison*, for appellants.

*R. Max Etter* and *Ellsworth I. Connelly*, for respondent.

FINLEY, J.—This is an action by a minority shareholder in two close corporations to determine the price at which he is contractually bound to sell his shares to the remaining

*Reported in 388 P. (2d) 539.

shareholders, and for an accounting by the corporations as to sums allegedly due him.

The parties formed the corporations in question in 1953 to purchase Radio Station KXLY and Television Station KXLY-TV, situated in Spokane, Washington. Joseph Harris and Norman Eisenstein (defendants-appellants) contributed the greater part of the financial backing for the venture and subscribed to 90 per cent of the capital stock of both corporations. Richard E. Jones, (plaintiff-respondent) agreed to manage the stations and took the remaining 10 per cent of the capital stock. At the time the corporations were formed, the parties entered into a written contract respecting the ownership and control of the stations. Among other things, it provided that Jones was to manage the stations until such time as notice of termination was given by either party, 60 days prior to the expiration of any calendar year. In the event that Jones was so terminated, the following sections controlled the disposition of his interest in the corporations:

" . . . the parties agree that Jones shall be obligated to sell and Eisenstein and Harris shall be obligated to buy jointly, at book value, the stock of Jones in the Radio Corp. and in the Television Corp. In determining book value *solely for the purposes hereof,* it is agreed that the depreciable assets shall be computed at cost, less eighty (80) percent of the depreciation as the same appears on the books. . . ." (Italics ours.)

and

"(e) If any part of the purchase price to be paid for either K X L Y or K X L Y - TV is required to be allocated to good-will, then it is agreed that in arriving at the book value . . . effect shall be given to the original amount required to be allocated to such good-will without any charge-off or depreciation, even though such charge-off or depreciation may be reflected in the books of said corporations."

In August 1958, the respondent's position as general manager was terminated by notice, effective December 31, 1958. Thereafter, the parties were unable to agree as to the meaning of the contract term "book value," the basic

factor in determining the price which the respondent was to receive for his shares. Appellants tendered $36,986.32 in settlement of Jones' claims. This was refused, and the present litigation ensued.

The trial court found that the contract was controlling insofar as it required the sale of the 10 per cent stock interest held by Jones, but considered the price setting mechanism (book value plus 20 per cent of depreciation taken) ambiguous. Relying, therefore, on the supposed intentions of the parties to pay a fair value for the shares of the respondent, the court, emphasizing equitable considerations, construed the entire provision as setting the price at "market value." When the liabilities were deducted from the appraised value of the corporation, the price of the 10 per cent interest was set at $91,919.30. To this was added the admitted salary item of $12,500 owing to the respondent, less certain personal withdrawals made by the respondent from the corporations, and judgment was entered for $95,006.87.

There can be no doubt that a 10 per cent interest in the two corporations is worth, in terms of market value, far more than the net worth figure on the corporate balance sheets of December 31, 1958, would indicate. Ten per cent of the December 31, 1958, net worth figure, plus 20 per cent of the depreciation and amortization accounts, totals only $25,936.33. It may be noted that experts set the market value of the corporations at upwards of $2,500,000 at the time of trial, and that by the time of this appeal appellants had sold these same corporations for $3,225,000, cash. It seems quite probable that *at the time the contract was drawn*, considering the way it was drawn, the parties contemplated the price of the shares resulting from "book value," plus 20 per cent of taken depreciation would continue to represent some reasonable approximation of the fair value. Had the corporations enjoyed a lesser degree of success, the formula might have accomplished the purpose very well, without any problem arising such as that herein involved.

■ But whether the parties reasonably should have anticipated that book value would not approximate the true value of the corporations, nevertheless, book value was the basic ingredient of the formula they chose to determine the "buy-out" price. Conceding that the term "book value" can vary from its basic or generally accepted meaning— *i.e.*, according to the purpose for which it is used—the parties here explicitly attempted to limit its meaning and to define book value "solely for the purposes" of the buy-out contract. Because they anticipated a rapid tax write-off in the form of depreciation, they arranged to use only 80 per cent of the amount in calculating the respondent's interest. The contract cannot be said to have been unfair or inequitable *when it was made*, and now is too clear to admit of interpretation to include and emphasize equities, non-existent at the inception of the contract, but which have evolved and now seem persuasive. Many close corporations have similar buy-out provisions, and the courts would do a disservice to business practice by substituting an "appraisal" or "market value" formula when hindsight shows that "book value," as originally conceived, has become unrealistic with the passing of time.

■■ The courts, of course, are not bound irrevocably to a single definition of "book value." But, when a term that has a generally accepted meaning is used, the parties are hard pressed afterward to claim their intent was otherwise. "Book value" normally means the value of the corporation as shown on the books of account of that corporation, after subtracting liabilities. *Schaffer v. Below*, 278 F. (2d) 619 (3d Cir. 1960). In such cases courts should accept the book accounts, when they are kept in accord with accepted accounting practice and not with an eye to the advantageous exercise of the "buy-out" option. If arbitrary valuations appear in the accounts, the court can then substitute amounts determined through correct accounting procedures. *Aron v. Gillman* (1955), 309 N.Y. 157, 128 N.E. (2d) 284, 51 A.L.R. (2d) 598.

In the present case the only accounts which the respondent attacks as inconsistent with proper accounting

procedure were set up exactly as the organization contract anticipated. Whatever the effect of this might be as to third parties, it is binding on the respondent. He cannot complain that the depreciation accounts were unduly swollen to obtain a rapid tax write-off; the contract anticipated this and provided that he would benefit by 20 per cent of the amount so taken being added in evaluating his shares. Nor can he complain that the absence of a good-will account led to an overevaluation of depreciable assets. Section (e) of the contract specified that good will would be considered in pricing his shares *only* *if* the Internal Revenue Service later required a reallocation of part of the purchase price to good will.[1] As he suggests no other discrepancy in the accounts, the respondent is bound by the balance sheets of the corporations as of December 31, 1958, the date his obligation to sell his stock interest matured. Respondent's 10 per cent interest in the corporations, at book value adjusted in accord with the contract, is as the appellant contends: $25,936.33.

The appellant also assigns error to the various factual findings of the trial court concerning the accounting between the corporations and the respondent. The $12,500 salary owing to the respondent is admitted, but the appellant claims a setoff in excess of this amount for withdrawals made by the respondent from the corporations. These withdrawals include both the payments to third persons and the expenses of Jones, himself. The personal or business nature of each and the authority to make them are questions of fact for the trial court, and cannot be disturbed on appeal when supported by substantial evidence.

The findings of the trial court concerning the accounting are affirmed. The judgment on the price to be paid for the shares belonging to Jones is reversed. The parties shall

---

[1] It was stipulated at trial that the term, "required to be allocated to good-will," found in the quoted part of section (e), was intended to refer only to possible action by the tax authorities finally denying the large depreciation allowances claimed by the corporations. At the time of trial, no such final action had been taken.

564

bear their own costs, and the case is remanded for entry of judgment in accord with the foregoing views and determinations.

ALL CONCUR.