[No. 2296-2. Division Two. August 11, 1976.]

ROGERS WALLA WALLA, INC., *Respondent*, v. CHARLES H. BALLARD, ET AL, *Appellants*.

*Perry J. Robinson*, for appellants.

*Evan L. Schwab* and *Davis, Wright, Todd, Riese & Jones*, for respondent.

PEARSON, J.—Defendants Charles H. and Eileen M. Ballard, husband and wife, appeal from a decree of specific performance of a "stock buy-out" agreement requiring them to sell the plaintiff, Rogers Walla Walla, Inc. (Rogers), 2,400 shares of its stock for the stated sum of $10,000. The decree is challenged as improper against Eileen M. Ballard individually because she had not signed the buy out agreement and the stock ownership was subsequently alleged to have been converted to joint tenancy. The appeal also challenges the availability of specific performance as a remedy. These challenges raise three issues: (1) the effect of a designation of the shares in joint tenancy upon their original community property status; (2) whether the shares had been subject to a stock split or a stock dividend as the result of a corporate merger; and (3) whether Rogers is a close corporation. For the reasons stated below we affirm the judgment.

Charles H. Ballard became an employee of Rogers Walla Walla Canning Company in 1962. On April 1, 1964, he became its executive vice-president, actively in charge of daily operations. On April 14, 1964, pursuant to resolution of the company's board of directors, Ballard entered into an agreement to purchase 100 shares of the company's treasury stock for $10,000. With the objective of securing 10

years of loyal service from Ballard, the agreement concluded as follows:

It is mutually agreed that if, at any time within ten years from date hereof, Ballard ceases employment or desires to sell said shares, or any portion thereof, they shall be sold only to Rogers, and said Rogers agrees to purchase said shares for $100 per share. This paragraph shall not apply in the event the company sells or disposes of all of its assets, or in the event the control of Rogers passes from the Rogers family.

A certificate representing 100 shares of Rogers $100 par value common stock was issued in the name of Charles H. Ballard.

In 1966, the board of directors became concerned over the large amount of earned surplus on the books. The board was also aware of the possibility of acquiring the controlling interest in Country Gardens, a vegetable processing corporation. In order for Rogers to reduce its earned surplus and gain control of County Gardens, a merger was agreed upon. Consequently, Rogers' authorized capital stock was increased from 30,000 shares of $100 par value common to 1 million shares of no-par common with a stated value of $6 per share. The existing 26,911 shares of outstanding common stock and 2,398 treasury shares were split 24 to 1. Rogers acquired a total of 218,434 outstanding shares of Country Gardens stock. Country Gardens shares held as its treasury stock and by Rogers were cancelled. The balance of Country Gardens common outstanding, apparently 67,775 shares, was converted 1 for 1 into shares of the merged corporation, Rogers Walla Walla, Inc. Rogers' earned surplus was ultimately capitalized, incident to the stock split, in the amount of $1,289,596.[1]

---

[1]The stated capital was changed from $3,000,000 to $6,000,000 by amendment of the Articles of Incorporation. However, in Rogers' March 31, 1968, financial statements the entry reflects an actual "adjustment" of earnings to capital of $1,289,596, calculated as follows: $6,000,000 stated capital divided by 1,000,000 newly authorized, no-par shares = $6 stated value per share. 29,309 outstanding and treasury shares × 24 = 703,416 shares after the split. 703,416 × $6 = $4,220,496, stated value of split shares. 29,309 × $100 = $2,930,900, par value of old shares.

On May 1, 1967, following the stock split, Ballard exchanged his 100-share certificate for a certificate showing Charles H. Ballard and Eileen M. Ballard to be the owners "as joint tenants with right of survivorship" of 2,400 shares of Rogers no-par common stock.

In 1971, Rogers was faced with new State Department of Ecology standards for water quality affecting its industrial waste disposal. Ballard was instructed by the board of directors to negotiate a contract with the City of Walla Walla for waste disposal. However, in an effort to secure better terms, he delayed signing the contract which resulted in the Department of Ecology imposing penalties and issuing an order terminating Rogers' industrial waste discharge permit. The board asked Ballard for his resignation for failure to carry out its orders. Following Ballard's resignation, Rogers sought return of the 1967 stock certificate and, in the pleadings, tendered the purchase price of $10,000. Ballard refused to return the certificate.

Rogers filed this action for specific performance of Ballard's 1964 agreement to resell the stock then issued to him, should his employment be terminated, on the theory that the original 100 shares were embodied in the 2,400 shares acquired in the 1967 stock split. The company also sought return of $1,680 in dividends paid to the Ballards on the stock since Mr. Ballard's resignation. The trial court, sitting without a jury, decreed specific performance and directed defendants to return the certificate representing 2,400 shares of stock upon tender of $10,000 plus interest, and entered a judgment for return of the dividends.

The court subsequently refused a motion to reopen on the question of the current value of the 2,400 shares, but did allow the Ballards to reopen to determine whether the 2,400 shares were the result of a stock dividend or stock split. The conclusion remained that a stock split had occurred.

---

$4,220,496 — $2,930,900 = $1,289,596, the amount by which earned surplus was reduced and capital surplus credited, in order to reflect the stock split and change from par to no-par stock.

The Ballards' chief argument on appeal proceeds as follows. As a prerequisite to a decree of specific performance, there must be an existing, valid contract binding the parties whose performance is sought. Even though a binding contract may once have existed, specific performance is improper if the contract has been abandoned or repudiated by the complaining party. 71 Am. Jur. 2d *Specific Performance* § 13, at 27-28 (1973). In this case, Charles Ballard entered into a 1964 agreement to buy and resell 100 shares of Rogers stock, which were issued in his name but concededly held as community property. Eileen Ballard did not sign the contract. However, in 1967 the former certificate was surrendered in exchange for a new certificate for 2,400 shares, describing joint tenancy ownership and shown as such on Rogers' records. No new contract similar to the 1964 one was signed. Thus, defendants argue (1) that the 1964 agreement requiring Charles Ballard to resell his shares upon leaving employment does not apply to the 2,400 shares or at most applies to 100 shares. This is because they say the agreement was superseded when Rogers called in the 100 shares and issued 2,400 replacement shares in joint tenancy, in effect a new shareholder's agreement without continuing the restriction on the sale of stock. (2) Even assuming the 1964 contract carried through to all the 2,400 substituted shares, it cannot now be the basis for specific performance, since Rogers has consented to ownership in joint tenancy by so listing in its records, and Charles Ballard cannot be forced to convey the subject of a contract to which his cotenant, Eileen M. Ballard, is not a party, without her consent.

We agree that one cotenant cannot transfer ownership of more than his share of property without the consent of the other, and that specific performance of an agreement should not lie against one who is not a party to the agreement. However, we conclude defendants cannot prevail on these theories.

Initially, although the oral arguments of trial counsel[2]

---

[2]The Ballards were represented by other counsel at trial.

have not been included in the statement of facts, it appears from the balance of the record on appeal that these theories were not presented in the superior court. Therefore, we need not consider them here. *Matthias v. Lehn & Fink Prods. Corp.*, 70 Wn.2d 541, 424 P.2d 284 (1967). But because defendants have pressed this argument with vigor and at length on appeal, and because defendants have been represented by three different law firms since the trial began, it is appropriate that we consider its merits.

On the merits, defendants' argument runs counter to their admission that the 100 shares of stock were originally acquired as community property and the unchallenged finding of fact that all acts done by Charles Ballard were on behalf of the marital community. Since Charles agreed on behalf of the marital community to resell the stock if he left Rogers' employ, both husband and wife were obligated by the contract terms. Nevertheless, the Ballards contend that the issuance of new stock, in joint tenancy and without restriction upon its sale, had the effect of negating Eileen's aspect of the original, community obligation to resell.

 Before disposing of this issue, we must consider the defendants' argument that the court's finding of a stock split of 24 to 1 is unsupported by the evidence. This is important because assuming the 1964 agreement remains viable, Ballards argue that the 1967 exchange was a 2,300 share dividend that should be unaffected by the decree of specific performance of the agreement to resell only 100 shares. The defendants contend the capitalization of earnings surplus in the amount of $3,000,000 settles the issue of dividend versus split.[3] While stock dividends are ordinarily paid out of earnings transferred to capital, a capitalization of earnings incident to an increase in the number of outstanding shares is far from conclusive as to whether the transaction is properly designated a dividend or split. 11 W. Fletcher, *Cyclopedia of Corporations* §§ 5359-5362.1 (M. Wolf rev. ed. 1971). Plaintiff's experts identified and ap-

---

[3] *See* footnote 1 for a discussion of the amount of earnings actually capitalized on the books.

plied several other factors in determining the character of the transaction. We summarize these considerations as follows: (1) It is clear that Rogers' board of directors *intended* the distribution be treated as a split; (2) the distribution resulted in a pronounced ratio of new shares to old; ordinarily, 25 percent is viewed as the maximum share increase for a stock dividend, as distinguished from a split;[4] (3) there was no recent history of Rogers' stock dividends to minimize this percentage test;[5] and (4) the per share unit value was markedly diluted, from $100 par value to $6 stated value, by the transaction. The court's finding that a split occurred is amply supported by the evidence and must stand on appeal.

The effect of a stock split is merely to change the form of the stockholder's interest in the company, but not the substance of his property. It simply involves a division of the outstanding shares into more units, each with less value. Each stockholder's proportionate share of ownership, his rights on dissolution, and the total value of his investment in the corporation are maintained intact. The only significant changes are the issuance of a new certificate and a reduction in market value of each share unit, which usually increases marketability of the shares. 11 W. Fletcher, *Cyclopedia of Corporations* § 5362.1 (M. Wolf rev. ed. 1971).

Here, the effect of the stock split, as the Ballards admitted, was to preserve the percentage of Rogers stock owned by them before the split. They were not required to give any consideration for the new certificate except the former one for 100 shares. The only arguable change in their position as shareholders was their designation as joint

[4]11 W. Fletcher, *Cyclopedia of Corporations* § 5362.1 (M. Wolf rev. ed. 1971); American Institute of Certified Public Accountants, Accounting Research Study No. 15 (1973), discussing Accounting Research Bulletin No. 43.

[5]A witness for Rogers, William Smart, C.P.A., testified that with "a regular recurring pattern" of previous stock dividends, "this percentage test [adopted as a presumption by Accounting Research Bulletin No. 43] does not have nearly the same validity."

tenants. Unfortunately for Ballards' position, the presumption is that the original 100 shares of stock acquired during marriage were held as community property, *Yesler v. Hochstettler*, 4 Wash. 349, 30 P. 398 (1892); they conceded as much in oral argument.

RCW 64.28.010[6] authorizes a husband and wife to change community property into property held in joint tenancy. Creation of a joint tenancy must be by written instrument, according to the statute, and nominal title to property in joint tenancy creates a rebuttable presumption of ownership in that form in, for example, bank and savings and loan accounts. RCW 30.20.015; RCW 32.12.030(3); RCW 33.20.030; *In re Estate of Green*, 46 Wn.2d 637, 283 P.2d 989 (1955). However, this presumption will be "met and destroyed" when the property was held by a marital community, unless evidence of intent to convert to the joint tenancy form is "clear, certain, and convincing." *Munson v. Haye*, 29 Wn.2d 733, 743, 189 P.2d 464 (1948). While Professor Harry M. Cross argues persuasively that a clear indication on a bank or savings association signature card that the account is in joint tenancy should preclude its treatment as a community property asset, Cross, *The Community Property Law in Washington*, 49 Wash. L. Rev. 729,

[6]RCW 64.28.010 provides:

"Whereas joint tenancy with right of survivorship permits property to pass to the survivor without the cost or delay of probate proceedings, there shall be a form of coownership of property, real and personal, known as joint tenancy. A joint tenancy shall have the incidents of survivorship and severability as at common law. Joint tenancy shall be created only by written instrument, which instrument shall expressly declare the interest created to be a joint tenancy. It may be created by a single agreement, transfer, deed, will, or other instrument of conveyance, or by agreement, transfer, deed or other instrument from a sole owner to himself and others, or from tenants in common or joint tenants to themselves or some of them, or to themselves or any of them and others, *or from husband and wife, when holding title as community property*, or otherwise, to themselves or to themselves and others, or to one of them and to another or others, or when granted or devised to executors or trustees as joint tenants: *Provided*, That such transfer shall not derogate from the rights of creditors." (Some italics ours.)

814-18 (1974),[7] the bare designation of the Ballards as joint tenants on the new stock certificate is insufficient proof that both husband and wife agreed to surrender their community interest in the prior certificate. Unlike the common practice of both cotenants signing a card to create a joint tenancy checking, savings, or investment account, there is not so much as a signature to suggest Mrs. Ballard's consent. *See In re Estate of Leinweber*, 62 Wn.2d 825, 384 P.2d 856 (1963).[8]

We have affirmed that the 1967 transaction was a split of 100 shares into 2,400, representing the Ballard community's same percentage ownership of Rogers as before the split. Under these circumstances, the presumption of community ownership of the 2,400 shares is controlling. We have previously observed that Charles Ballard's 1964 agreement to resell the stock was on behalf of, and binding upon, the community. Thus, the obligation was enforceable against the community. *Malotte v. Gorton*, 75 Wn.2d 306, 450 P.2d 820 (1969); Cross, *The Community Property Law in Washington*, *supra* at 820-24.

Defendants next assign error to the trial court's findings that Rogers is a close corporation whose shares have no active market and no readily ascertainable market value and contend, therefore, that this stock purchase agreement is an improper subject for specific performance.

Specific performance is appropriate when there is no adequate remedy at law. Both Rogers and the Ballards rely on *McLeod v. Keith*, 69 Wn.2d 201, 417 P.2d 861 (1966), a case involving a close corporation, which states the following rule at page 205:

> "Generally speaking, where the corporate stock which is the subject of a contract of sale of which

[7]*Cf. Anderson v. Anderson*, 80 Wn.2d 496, 495 P.2d 1037 (1972); *but see In re Estate of Hickman*, 41 Wn.2d 519, 250 P.2d 524 (1952).

[8]Having disposed of the argument that the form of stock ownership was changed from community property to joint tenancy, we need not decide whether the attempted transfer of form of ownership may have been in derogation of Rogers' latent creditor's rights, as forbidden by RCW 64.28.010.

specific performance is sought is of unknown and of not easily ascertainable value, or is unobtainable in the open market, it has been held that a suit for the specific performance thereof may be maintained, the remedy at law in such a case being regarded as inadequate."

The Ballards argue that Rogers shares are not closely held, since the stock redistribution resulted in over 700,000 shares outstanding, and shares have been traded in recent years. However, Rogers ownership and management are substantially in the hands of the Rogers family which, when Charles Ballard resigned, held about 60 percent of outstanding Rogers stock and four of the seven positions on the board of directors. The stock was not listed on any securities exchange. It was traded infrequently, generally in the Walla Walla area. Defendants formally admitted before trial, and the testimony was in accord, that the open market value of the stock was unknown.[9] We find ample evidence to support the trial court's application of the rule in *McLeod v. Keith, supra.*

The defendants' motion to reopen to determine the value of the 2,400 shares of stock was based on the theory that specific performance of an agreement to resell for $10,000 securities hypothetically worth $120,000, is unconscionable and should be refused.

A motion to reopen a case for additional testimony is addressed to the sound discretion of the trial court, and the court's ruling will not be disturbed except for manifest abuse. *Fuller v. Ostruske*, 48 Wn.2d 802, 296 P.2d 996 (1956). The Ballards had an opportunity to air the stock valuation issue at trial. They failed to show that the proposed evidence was newly discovered or could not have been previously supplied with reasonable diligence.

---

[9]The term "close corporation" has been variously defined to include relative paucity of shareholders and substantially identical control of ownership and management, but one common denominator is that the corporate shares have no ready market. *See* F. O'Neal, *Close Corporations: Law and Practice* § 1.02 (1971); *Brooks v. Willcuts*, 78 F.2d 270, 273 (8th Cir. 1935); *Donahue v. Rodd Electrotype Co. of New England, Inc.*, ........ Mass. ........, 328 N.E. 2d 505, 511 (1975).

■ Moreover, even had the "new" evidence overcome the previous testimony that no readily ascertainable market value existed for the shares and demonstrated a wide disparity between $10,000 and current market value, the agreement was subject to specific performance because fairness of a stock buy out contract should be examined as of the time it is signed. *Jones v. Harris,* 63 Wn.2d 559, 388 P.2d 539 (1964). Although market value of the shares in 1964 was unknown, Charles Ballard recognized that the share price of $100 was a bargain for him. Stock purchase restrictions such as this are often employed to enable shareholders in close corporations to control the identity of their associates and maintain harmonious business relationships. Note, *Stock Transfer Restriction Enforced Despite Nominal Price Term,* 16 Stan. L. Rev. 449 (1964). In view of this desirable end, absent proof of overreaching or fraud, a great disparity between the contract price and the stock's actual value will not defeat specific performance. *In re Estate of Mather,* 410 Pa. 361, 189 A.2d 586 (1963); *see Jones v. Harris, supra.* The court properly exercised its discretion in declining to reopen on this issue.

We find no other error. The judgment is affirmed.

PETRIE, C.J., and REED, J., concur.

Petition for rehearing denied September 30, 1976.

Review denied by Supreme Court February 23, 1977.