[No. 10926-7-III.   Division Three.   February 25, 1992.]

RICHARD PETERS, *Respondent*, v. RICHWELL RESOURCES, LTD., *Defendant*, JAMES H. HAWLEY III, ET AL, *Appellants*.

*Santiago E. Juarez,* for appellants.

*Gary R. Penar,* for respondent.

THOMPSON, A.C.J. — The trial court awarded Richard Peters summary judgment against James H. Hawley III for breach of a stock transfer agreement. The judgment amount was based on the value of the stock as established in a separate stock option agreement. Hawley appeals. We reverse and remand for recalculation of damages.

Richard Peters loaned $15,000 to Richwell Resources, Ltd. (Richwell). The loan was evidenced by a promissory note dated July 3, 1989, calling for (1) payment of principal in 30 days and (2) $2,000 interest in 45 days.

The same date James H. Hawley III executed the note on behalf of Richwell as president, he also executed a document entitled "Guarantee of Stock Option" in his individual capacity. By its terms, Hawley granted Peters an option to purchase 25,000 shares of his Richwell stock for 35 cents per share. The option was for a 90-day period commencing July 3, 1989.

A third document entitled "Assignment and Transfer of Stock Ownership" was executed July 3, 1989. By its terms, Hawley assigned and conveyed to Peters 50,000 shares of his Richwell stock. Although the document recited the stock was owned by Hawley, and was signed by Hawley individually, it stated:

> This ASSIGNMENT and TRANSFER OF STOCK OWNERSHIP is made on behalf of Richwell Resources, Ltd. by HAWLEY as a portion of the payments due under the terms and conditions of that certain Promissory Note, dated July 3rd, 1989, by and between Richwell Resources, Ltd. and PETERS.

Pursuant to the terms of the "Assignment and Transfer of Stock Ownership" agreement, Hawley was to either deliver the stock certificates to Peters in negotiable form or provide the documents necessary to convey ownership to Peters within 10 days.

On January 11, 1990, Peters filed a complaint against Richwell and Hawley. He alleged Richwell failed and refused to pay the principal and interest due on the note and Hawley failed and refused to deliver the 50,000 shares of stock. Peters demanded judgment against Richwell for $15,000 principal, $2,000 interest for July 3, 1989, to August 17, 1989, and 12 percent interest on the principal from August 17, until the date of judgment. As to Hawley, Peters demanded specific performance of the stock transfer agreement or, alternatively, for a money judgment based on the highest market value of the stock between July 13, 1989, and the date of judgment.

Peters moved for summary judgment on April 27, 1990. In a supporting affidavit, Peters averred the Richwell stock was listed and traded on the Vancouver, British Columbia, stock exchange until February 1990, but was no longer available or of "any ascertainable value". In his legal memorandum, Peters contended he was entitled to a money judgment against Richwell on the note *and* either specific performance of the stock transfer agreement as to Hawley or a money judgment against Hawley based on damages for nondelivery

of the stock, using the 35 cents per share stock option price as the measure.

On May 10, Hawley filed a response to the motion for summary judgment. Attached was a signed, unnotarized and undated pleading entitled "Affidavit".[1] In this responsive document, Hawley stated he had already transferred 22,000 shares of stock to Peters and Peters had breached his promise to obtain additional financing. Hawley contended the stock option price was an arbitrary amount bearing no relationship to book value or trading value, and the trading price at the time the agreement was executed (12 cents Canadian per share) was the applicable value.

On May 14, Peters filed a reply in which he argued the responsive pleadings should be stricken. He contended Hawley's response was untimely, his statements were not based on personal knowledge, and the purported affidavit was not in the proper form. On May 18, the day of the summary judgment hearing, Hawley filed an affidavit identical to the previous document, except it was notarized.

On June 4, a judgment was entered against Hawley in the amount of $17,500 Canadian, together with interest, statutory attorney fees, and costs. The $17,500 figure was calculated by using the stock option price. Hawley's affidavit was not considered because it was untimely. A separate judgment was entered against Richwell for $15,000 plus interest, statutory attorney fees, and costs. Hawley appeals.[2]

Hawley contends the court erred in using the arbitrary stock option price to establish damages. He argues the market value of the stock at the time the contract was executed is the appropriate measure of damages for breach of a stock transfer agreement. He cites *Jones v. Harris*, 63 Wn.2d 559,

---

[1]Hawley's pleading clearly did not qualify as an affidavit, nor did it meet the requirements of unsworn statements under RCW 9A.72.085.

[2]Richwell has not appealed nor does Hawley contend Peters received a double recovery by receiving a judgment against Richwell on the note and a judgment against Hawley for breach of the stock transfer agreement, even though as previously noted herein, the stock transfer agreement specifically stated the transfer of stock was to be *part payment on the note.*

388 P.2d 539 (1964); *Rogers Walla Walla, Inc. v. Ballard*, 16 Wn. App. 81, 553 P.2d 1372 (1976), *review denied*, 88 Wn.2d 1004 (1977); *Estate of Mather*, 410 Pa. 361, 189 A.2d 586 (1963).

Peters also contends the stock price at the time of the execution of the contract is the appropriate measure of damages, *Jones v. Harris, supra*, but argues the stock option price controls because it was a fair, agreed upon price and a clear expression of the parties' intent and understanding of value. His argument is in the nature of a liquidated damage argument.

■ Liquidated damage clauses will be upheld if the type of harm anticipated is very difficult or impossible to measure accurately and the means for computing damages is reasonably related to the expected harm. *Knight, Vale & Gregory v. McDaniel*, 37 Wn. App. 366, 371, 680 P.2d 448, *review denied*, 101 Wn.2d 1025 (1984). However, there is no language in either the stock transfer agreement or the stock option agreement which indicates the parties intended to use the option price as a measure of damages for nondelivery nor are damages impossible to measure.

In *Jones*, a corporate ownership and control agreement was executed when a closely held corporation was created. The agreement contained a requirement that the manager-minority shareholder must sell his stock to other shareholders at book value if his position were terminated. The manager's employment was terminated, and although the agreement contained a formula for establishing book value, the parties were unable to agree on its meaning. *Jones* held that if a buyout formula in an agreement was neither unfair nor inequitable at the time the agreement was entered into, the court would not substitute its formula for that contained in the agreement.

We find *Jones* inapplicable because there is no "pricing formula" in the stock transfer agreement. Further, there was no evidence before the trial court to support Peters' contention the option price was intended to control damages for nondelivery of stock under the stock transfer agreement.

*Estate of Mather, supra,* was an appeal from a judgment ordering specific performance of a stock option agreement. The appellant argued the agreement was an invalid restraint on alienation because the option price was clearly very unfair and unchangeable. The judgment was affirmed. *Mather* determined that any discrepancy between an option price and actual value does not itself invalidate a stock option agreement or defeat specific performance. We fail to see how *Mather* is of assistance here.

*Ballard* was an appeal of a decree of specific performance of a stock buyout agreement. Stock value was only a peripheral issue, the stock was that of a closely held corporation, and the court's reference to stock value in the opinion is dictum. According to the dictum, the fairness of the price established in a stock buyout contract should be examined as of the time the contract is signed.

Neither party cites controlling or persuasive authority on the measure of damages applicable to nondelivery of stock.

Before Washington adopted the Uniform Commercial Code (UCC), RCW Title 62A, it was determined the measure of damages for a seller's failure to timely deliver stock should be the same as a seller's failure to timely deliver goods. *Allen v. Blyth,* 173 Wash. 409, 23 P.2d 567 (1933). At the time *Blyth* was decided, the measure of damages was

> the difference between the market value of the goods at the time when they should have been delivered and their value at the time they were actually delivered; and this rule is applicable to corporate stock. Sedgwick on Damages, Vol. 2 (9th ed.), §§ 735c, 736; *Saunders v. United States Marble Co.,* 25 Wash. 475, 65 Pac. 782 [(1901)]; *Belden v. Krom,* 34 Wash. 184, 75 Pac. 636 [(1904)].

*Blyth,* at 411.[3]

Section 2-713 of the UCC, adopted subsequent to *Blyth,* provides the following measure of damages for nondelivery of goods:

> (1) Subject to the provisions of this Article with respect to proof of market price (RCW 62A.2-723), the measure of

---

[3]Although not cited in *Blyth,* the Uniform Sales Act, former RCW 63.04-.680(3), enacted in Washington in 1925, governed the sale of goods.

damages for nondelivery or repudiation by the seller is the difference between the market price at the time when the buyer learned of the breach and the contract price together with any incidental and consequential damages provided in this Article (RCW 62A.2-715), but less expenses saved in consequence of the seller's breach.

RCW 62A.2-713.

Washington Comment 1 to RCW 62A.2-713 contains a helpful comparison of the UCC and the Uniform Sales Act (USA) in effect when *Blyth* was decided.

> This subsection effects a major change. The basic measure of damages is the same as that under USA 67(3) (RCW 63.04.680(3)), the difference between market price and contract price. However, the market price used in the formula would be that existing at the time the buyer learned of the breach. (As to difficulties involved in identifying that time, see 36 Wn LR 459). Under the prior statute, in computing damages for breach by non-delivery, the market price used was that at the time fixed for delivery (or, if no time fixed, at the time of refusal to deliver). See cases, 36 Wn LR 459, n 73. In computing damages for breach by anticipatory repudiation, the time fixed for performance is generally the starting point. 3 Williston, Sales § 587 (rev ed 1948); Washington Comment, sec. 2-723. The change to market price at the time the buyer learns of seller's breach is justified by the force of sec. 2-712, which permits the buyer to cover. It is assumed that he will cover. Should he fail to do so, he should not be permitted to recover more if the price has risen.

■ Although investment securities are specifically *excluded* from article 2 and specifically *provided for* in article 8,[4] some jurisdictions have applied section 2-713 to determine damages for nondelivery of stock. *E.g., Buford v. Wilmington Trust Co.*, 841 F.2d 51 (3d Cir. 1988). We see no reason, nor has one been suggested to us, why the sale of goods measure should not be applied by analogy under the facts presented.

---

[4]Article 2 governs the sale of "goods". "Goods" are "all things (including specially manufactured goods) which are movable at the time of identification to the contract for sale *other than* the money in which the price is to be paid, investment securities (Article 8) and things in action". (Italics ours.) RCW 62A.2-105.

■ The adoption of the UCC measure of damages does not end our analysis. Although section 2-713 provides that the buyer's measure of damages is the "market price" at the time the buyer learned of the breach, there is a split of authority as to which "market price" is to be used. As explained in 4 R. Anderson, *Uniform Commercial Code* § 2-713:6, at 462 (3d ed. 1983):

> There is a division of authority as to the time as of which "market price" is to be determined in applying UCC § 2-713(1). The majority rule is that the phrase "learned of the breach" is the equivalent of "learned of the repudiation," and that market price should be fixed at the time when the buyer learned of the repudiation. The minority rule is that the time when the buyer "learned of the breach" should be interpreted to mean the time for seller's performance.

The importance of the distinction was explained by Professor Cosway when comparing the UCC and the USA.

> [I]f [the buyer] proceeds under the present section [*i.e.*, 2-713] the amount of his recovery will reflect the market value of the goods as of the time he learned of the breach, not as of the time designated for performance. This is because a normal buyer, faced with a repudiation or breach, will immediately seek to replace the goods, thus the market at, or soon after, that time is the proper measure of his damages.[5]
> This departs from existing law by which the measure of damages turns on the market value at the time and place of performance. The major problem, under either rule, ultimately is the fact question of when the breach occurred or, under the Code, when the buyer learned of the breach.

(Footnote omitted.) Cosway, *Sales — A Comparison of the Law in Washington and the Uniform Commercial Code*, 36

---

[5]On the other hand, section 2-713 damages are not necessarily limited to a buyer who covers: "There is . . . no reason to believe that a buyer will be barred from a recovery merely because he chooses not to purchase any goods in place of the goods called for by the original contract. An expectation interest, traditionally labeled the "benefit of the bargain," is created once a contract has been formed. The buyer is entitled to the benefit of that expectation, even if he chooses not to pursue the goods with which that expectation is associated once the seller has repudiated the contract and failed to deliver conforming goods." Wallach, *The Buyer's Right to Monetary Damages*, 14 U.C.C. L.J. 236, 242 (1981-1982).

Wash. L. Rev. 440, 459 (1961). We are persuaded by the majority view.

Applying the UCC sale of goods measure of damages here is consistent with the general principle of contract damages.

> Contract damages are ordinarily based on the injured party's expectation interest and are intended to give that party the benefit of the bargain by awarding him or her a sum of money that will, to the extent possible, put the injured party in as good a position as that party would have been in had the contract been performed.

*Mason v. Mortgage Am., Inc.*, 114 Wn.2d 842, 849, 792 P.2d 142 (1990).

The stock transfer agreement required delivery of the stock within 10 days from the date the transfer agreement was executed.[6] When section 2-713 is applied by analogy, damages for nondelivery are equal to the value of the stock on the date Peters learned of the breach. That date is a question of fact to be determined by the trial court. Since the stock was publicly traded, once Peters learned of the breach he could have covered by acquiring the stock on the open market.[7] The price to cover may have been higher or lower than that specified in the stock option agreement.

In reviewing summary judgment orders, the appellate court engages in the same inquiry as the trial court. *Neubert v. Yakima-Tieton Irrig. Dist.*, 117 Wn.2d 232, 814 P.2d 199 (1991). All evidence and the inferences therefrom are viewed most favorably to the nonmoving party and a judgment is granted only if the requirements of CR 56(c) are met. *Del Guzzi Constr. Co. v. Global Northwest Ltd.*, 105 Wn.2d 878, 882, 719 P.2d 120 (1986).

---

[6]This is a most unusual provision because the stock transfer agreement, executed on July 3, 1989, stated the transfer was intended to constitute part payment on the note and payment on the note was not due until August 2.

[7]Peters should not be permitted to play the market at Hawley's expense any more than Peters should be required to cover or be limited to damages based on an option price lower than cover costs. The remedy is not perfect, of course, because if the stock had been transferred, it might have appreciated or depreciated during the time Peters held it. It is pure speculation as to how long Peters would have held it.

It is undisputed that Peters loaned $15,000 to Richwell. The stock transfer agreement provided that repayment was to be made, in part, by Hawley's transfer of 50,000 shares. Peters did not get the stock, at least not all of it, and Hawley failed to timely file a controverting affidavit. Hawley is liable in damages for nondelivery based on the measure of damages adopted in this opinion. If the value of the stock is less than the balance owed on the note, Peters' right to a judgment for the difference is only against Richwell, since Hawley did not sign the note in his individual capacity. Since the date when Peters learned of the breach is a material fact under the applicable damage remedy, the parties may have to submit supplemental affidavits and, if this fact is disputed, a trial may be necessary.

We reverse and remand for recalculation of damages.

MUNSON, J., and GREEN, J. Pro Tem., concur.