# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| KAMALJIT SINGH and HARMINDER KAUR, husband and wife; KENT VALLEY APT., LLC, a Washington Limited Liability Company, | ) ) ) ) ) | NO. 72817-2-I |
| Respondents, | ) ) | |
| | ) | DIVISION ONE |
| v. | ) ) | |
| HARJIT KAUR GILL, and JOHN DOE GILL, wife and husband; and HARBANS GREWAL and JASBIR KAUR GREWAL, husband and wife; SATWINDER SHARMA and JANE DOE SHARMA, husband and wife; CHICAGO TITLE INSURANCE COMPANY OF WASHINGTON, as trustee under that certain deed of trust recorded under Recording No. 20110218001102, | ) ) ) ) ) ) ) ) ) ) ) | UNPUBLISHED OPINION |
| Appellants. | ) ) ) | FILED: January 19, 2016 |

LAU, J. – Harbans Grewal, Jasbir Kaur Grewal, and Harjit Kaur Gill

(collectively the Grewals) appeal from the judgment entered in favor of Kamaljit Singh

and Harminder Kaur (collectively the Singhs). [1] Because the Grewals fail to

demonstrate any error or abuse of discretion in the trial court's evidentiary rulings,

use of the interpreter, and determination of reasonable attorney fees, we affirm.

---

[1] Where necessary for clarity, we use the parties' first names.

FACTS

The trial court's detailed findings of fact, entered following a seven-day bench trial, support the following summary of events. For purposes of appeal, appellants do not challenge the sufficiency of the evidence to support the trial court's findings of fact.[2]

Respondents (plaintiffs below) Kamaljit Singh and Harminder Kaur are husband and wife. In 2006, Kamaljit and a business partner purchased real estate in Kent for future development. They later transferred title to the property to Harminder. In February 2009, Harminder conveyed the property to Kent Valley Apartments, LLC (Kent Valley LLC).

Appellants Harbans and Jasbir Grewal are husband and wife and reside in British Columbia. Harjit Kaur Gill is Harbans' sister. Both Harbans and Jasbir are experienced business owners.

In July 2009, Harbans contacted Kamaljit to discuss opening a business in Washington. In September 2009, Harminder agreed to sell a 50 percent interest in Kent Valley LLC to Harjit. Harbans, under the authority of a power of attorney, negotiated the transaction on Harjit's behalf as her attorney-in-fact. Harjit paid Harminder the agreed-upon price of $235,000. Harminder and Harjit executed an operating agreement reflecting that each owned 50 percent of Kent Valley LLC.

---

[2] In their reply brief, appellants contend that the evidence was insufficient to support several findings of fact. Because they raise these arguments for the first time in the reply brief, we decline to consider them. See Cowiche Canyon Conservancy v. Bosley, 118 Wn.2d 801, 809, 828 P.2d 549 (1992).

Kamaljit and Harbans also engaged in several smaller financial transactions during the remainder of 2009.

In December 2010, Harjit (through Harbans) entered into an agreement to purchase Harminder's remaining 50 percent interest in Kent Valley LLC for a cash payment of $235,000. On December 20, 2010, Harbans told Kamaljit that he had Harjit's check in the amount of $235,000 for the purchase. On the same day, Harbans and Kamaljit went to the Secretary of State's Office in Olympia and filed an Amended Annual Report for Kent Valley LLC. The Report listed Harjit as the sole member of Kent Valley LLC and Harbans as the registered agent.

After leaving the Secretary of State's Office, Kamaljit asked Harbans for the check. Harbans said he would give Kamaljit the check as soon as the parties completed the transactional documents.

Kamaljit and Harbans then went to the home of Sabir Khan and asked Khan to prepare documents memorializing the transaction. Several of the documents listed Harjit as the sole owner of Kent Valley LLC. One document, entitled "Agreement between Harjit Kaur and Harminder Kaur," provided for the payment of $235,000 cash for the remaining 50 percent interest in Kent Valley LLC.

After leaving Khan's house, Kamaljit and Harbans took the agreements to a bank for signature and notarization. Kamaljit again asked for the check. Harbans informed him that the agreements were defective and that he would deliver the check after his attorney reviewed and approved the sale documents. During the following weeks, Harbans contacted Kamaljit several times and asked for additional information so that the transaction could close.

On December 21, 2010, Harbans retained John Meenk, a Bellingham attorney, to review the sale documents. Based on his conversations with Harbans, Meenk believed that Harjit had paid Harminder $235,000 cash for the additional 50 percent interest in Kent Valley LLC on or before December 20. In drafting the terms of an addendum to the purchase and sale agreement, Meenk assumed that Harjit had already paid $235,000 in cash. At Harbans' request, Meenk also drafted a $675,000 promissory note for Harjit's signature, payable to Harbans' wife Jasbir, and a related Deed of Trust against Kent Valley LLC to secure the promissory note.

On January 8, 2011, one day after Kamaljit left for a trip to India, Harbans went to Harminder's home and gave her Harjit's $235,000 check. Harminder showed the check to Manmohan Grewal, a business associate, who was present at the meeting. Harminder and Harbans then went to a UPS store to sign the addendum in front of a notary public. At Harbans' request, Harminder agreed not to deposit the check until Harbans transferred sufficient funds to Harjit's account.

On January 25, 2011, Harjit signed the $675,000 promissory note, payable to Harbans' wife Jasbir, and the Deed of Trust securing the note. The trial court found that the Grewals failed to present any "credible evidence . . . to support the Defendants' contention that Jasbir advanced a reasonably equivalent value to Harjit in exchange for the $675,000.00 note." Clerk's Papers (CP) at 1803. On February 18, 2011, Harbans' attorney recorded the Deed of Trust, without notice to the Singhs and without Harminder's authorization.

Kamaljit returned from India in late February 2011 and unsuccessfully attempted to contact Harbans for authorization to deposit the check. Kamaljit and

Harminder eventually presented the check for payment at a Bank of America branch. The bank refused to honor the check because it was written on a "Seafirst Bank" account that was closed in 2007. CP at 1803.

In March or April 2011, Harminder and Manmohan travelled to Harbans' home in Abbottsford, British Columbia. At the meeting, Harbans and Jasbir informed Harminder that Harjit no longer wished to purchase Harminder's remaining interest in Kent Valley LLC and recommended that Harminder sell the property and split the proceeds according to the terms of the 2009 operating agreement.

On April 19, 2011, the Singhs filed a complaint for breach of contract against Kent Valley LLC, Harjit, and Harbans. Among other things, the complaint alleged that Harbans had drawn up and recorded the Deed of Trust for $675,000 without Harminder's knowledge. The complaint sought monetary damages and a declaration that the Deed of Trust was null and void. The court dismissed the action in October 2012 for lack of personal jurisdiction.

On April 19, 2013, Jasbir executed an "Assignment of Beneficiary's Interest in Deed of Trust," purporting to assign her interest in the Deed of Trust to Satwinder Sharma as security for a loan. Jasbir did not endorse the $675,000 note to Sharma.

On May 6, 2013, Kamaljit and Harminder filed the current action against Harbans, Harjit, Jasbir, Sharma, and others, raising claims for breach of fiduciary duty and fraudulent transfer. Harjit asserted counterclaims for breach of contract, fraudulent transfer and to quiet title.

At trial, Harbans flatly denied giving the Singhs a $235,000 check or promising to give them a check for the transfer of Harminder's remaining interest in Kent Valley

-5-

LLC. Harjit testified that she believed the Singhs had taken the blank check from her belongings that she had stored at their home.

Harbans claimed that in May 2010, while the parties were visiting India, Harjit loaned Kamaljit a total of $235,000. The Grewals delivered the loan proceeds to Kamaljit – 1.1 million rupees in cash– in a "gym bag." Report of Proceedings (RP) (Sept. 17, 2014) at 932. Harbans asserted the parties had an oral agreement that if Kamaljit was unable to repay the loan, the Grewals would forgive the loan in exchange for Harminder's remaining interest in Kent Valley LLC. When Kamaljit failed to repay the loan, the Grewals forgave the loan in exchange for Harjit's sole ownership of Kent Valley LLC.

Harjit testified that the money she loaned Kamaljit came from real estate transactions in India and a loan from a real estate broker. Harjit asserted that the proceeds were all in cash and there were no documents evidencing the transactions. Harbans acknowledged that there were no written documents in the record evidencing the loan to Kamaljit or the loan forgiveness provisions.

Jasbir testified that Harjit owed her $675,000, but that she could no longer find the records that supported that amount. Harjit testified she no longer knew the date or amounts of the loans from Jasbir that totaled $675,000 and that she signed the promissory note and deed of trust because Jasbir told her to.

At the conclusion of the evidence, the trial court rejected the Grewals' account as not credible and dismissed Harjit's counterclaims with prejudice. The court found by clear, cogent, and convincing evidence that by his misrepresentations in presenting the $235,000 check, Harbans intended to cause a delay that allowed him

to record the $675,000 deed of trust, and that he fraudulently induced Harminder to transfer her interest in Kent Valley LLC to Harjit without receiving any consideration in return. The court further concluded that Harjit had breached her fiduciary duties to Harminder.

Based on the Grewals' fraud, the court enjoined the Grewals from taking any action to enforce the deed of trust, rescinded the purchase agreement for Harminder's remaining interest in Kent Valley LLC, and declared Kent Valley LLC's conveyance of the deed of trust void as a fraudulent transfer. The court directed that Kent Valley LLC be dissolved and a receiver appointed to wind up the company's affairs. The court awarded the Singhs attorney fees and costs of $343,291.02.

The Grewals appeal.

## ANALYSIS

### Interpreter During Trial

The Grewals contend that the trial court committed reversible error when it failed to use an interpreter consistently during the testimony of Kamaljit and Harbans. They argue that the trial court's resulting confusion and inability to understand portions of these key witnesses' testimony undermined and distorted the court's credibility determinations and the accuracy of its findings of fact.

But the Grewals raise the alleged error for the first time on appeal. Moreover, the trial court followed the procedure for using the interpreter that counsel for both parties proposed and agreed to. Finally, the record provides no support for the claim that the lack of an interpreter during portions of the witnesses' testimony prejudicially affected the court's credibility determinations and findings of fact.

-7-

At the beginning of the bench trial, the court appointed a Punjabi interpreter, who was available throughout the trial. When the court asked whether the interpreter would be used for the entire trial, counsel for the Singhs explained that the parties had agreed to use the same procedure they used for depositions. Some of the plaintiffs' witnesses would require the interpreter to translate everything. Other witnesses would use the interpreter only when necessary:

> [W]hen [Kamaljit] testifies, [the interpreter will] primarily be acting as backup. If [Kamaljit] can't articulate a phrase or find the right word, he may ask [the interpreter] for assistance. That's the way we handled it in the depositions, as well.

RP (Sept. 3, 2014) at 11.

Counsel for the Grewals agreed:

> I think that's basically the way we did handle it. Some of the parties need help with certain words and idioms they just don't understand in the English language, but they generally grasp the language.

RP (Sept. 3, 2014) at 11.

The trial court then summarized:

> So if I understand it correctly, only when a witness is on the stand who may need an interpreter will we use the services of the interpreter. But if the witness understands English sufficiently and doesn't want an interpreter, we will conduct the interrogation of the witness without an interpreter. Is that what you're suggesting, both counsel?

RP (Sept. 3, 2014) at 12.

After consulting with his clients, counsel for the Grewals agreed with the court's understanding.

Generally, an appellate court will not consider a nonconstitutional issue or argument that is raised for the first time on appeal. See State v. Kirkman, 159 Wn.2d

918, 926, 155 P.3d 125 (2007). During the trial, the trial court occasionally requested the assistance of the interpreter. Kamaljit and Harbans used the interpreter for some of their answers, but otherwise testified in English. Counsel for the Grewals did not raise any objections to the trial court's use of the interpreter. Nor did they ask the court to use an interpreter at any point during the trial. On appeal, the Grewals concede that they "did not officially object" to the trial court's failure to use an interpreter consistently during either Kamaljit's or Harbans' testimony. Br. of Appellant at 23. Under the circumstances, the Grewals have not preserved the alleged error for review.

In addition, at the beginning of the trial, the court asked whether the interpreter should be used for the entire trial. Counsel for both parties expressly acknowledged that they had agreed the use of an interpreter was not necessary for the entire trial and that the witnesses would use the interpreter only when necessary. Because the trial court followed the procedure that the parties requested and agreed to, the error, if any, in not using the interpreter throughout the trial was invited. See In re Marriage of Morris, 176 Wn. App. 893, 900, 309 P.3d 767 (2013) (the doctrine of invited error prohibits a party from setting up an error below and then complaining of it on appeal).

Finally, the record fails to demonstrate any error or abuse of discretion in the trial court's use of the interpreter. RCW 2.43.010 declares the policy of this state to secure the rights "of persons who, because of a non-English-speaking cultural background, are unable to readily understand or communicate in the English language, and who consequently cannot be fully protected in legal proceedings

unless qualified interpreters are available to assist them." We review the trial court's decision to appoint or use an interpreter for an abuse of discretion. See State v. Trevino, 10 Wn. App. 89, 94–95, 516 P.2d 779 (1973).

In support of the claim that the trial court erred in permitting Kamaljit and Harbans to present portions of their testimony in English, the Grewals point to a number of the court's comments, including statements that it was "lost," "hanging on for dear life," having "difficult[y] follow[ing]," and "miss[ing] things." RP (Sept. 4, 2014) at 202; RP (Sept. 8, 2014) at 367; RP (Sept. 4, 2014) at 339; RP (Sept. 17, 2014) at 869. But the Grewals' arguments fail to identify or address the full context of the court's comments.

The record demonstrates that in each case of the trial court's alleged expressed confusion or misunderstanding, the court either asked for and received clarification or the testimony was repeated to provide any necessary explanations. At one point after Harbans had already testified at length, Harbans' counsel asked the court whether it had been able to understand the testimony or wanted a "stand-by" interpreter. RP (Sept. 17, 2014) at 897. The court replied:

> THE COURT: No. I -- I was able to understand Mr. Grewal. I did have to interrupt him every once in a while and ask him to repeat something, but I didn't have any trouble when he, you know, clarified things.
>
> So if you don't mind me inter[rupting] him to ask him to repeat things from time to time, I don't think we need an interpreter. But if he wishes to have an interpreter, then we should have one.
>
> MR. GREWAL: Well, if there's any problem, then we can have. Otherwise, I'm okay.

RP (Sept. 14, 2014) at 898.

Counsel for the Grewals never asked for the interpreter at any point during Harbans' or Kamaljit's testimony.

The Grewals also rely on the verbatim report of proceedings, which designates short portions of Kamaljit's and Harbans' testimony as partially unintelligible or inaudible. But they do identify any specific, material deficiencies in the transcript. Nor does the court reporter's inability to transcribe portions of the testimony constitute evidence that the parties, counsel, or the trial court did not understand material portions of the testimony.

In summary, the Grewals have not identified any trial court confusion or misunderstanding that was not clarified. The mere fact that the court rejected Harbans' account of the disputed transaction does not constitute evidence of confusion. The Grewals fail to demonstrate any error or abuse of discretion in the court's use of the interpreter.

Exclusion of Telephone Records

The Grewals contend the trial court erred in excluding late-disclosed telephone records. They argue that the trial court based its ruling on a misunderstanding of the parties' discovery stipulation and applied an erroneous legal standard. Generally, we review the trial court's evidentiary rulings for an abuse of discretion. Sintra, Inc. v. City of Seattle, 131 Wn.2d 640, 662-23, 935 P.2d 555 (1997)

Prior to trial, the Grewals sought to admit three exhibits of telephone records for Harbans and Harjit. In his offer of proof, counsel explained:

> I'm asking the Court to allow me to offer an additional three exhibits on the defendants' side, which are phone records of the defendants Harjit Gill and Harbans Grewal for the period of basically 2009, May through

September. There's a period when there was a formation of an agreement, and I hadn't submitted these before because I didn't have them until just recently. I just received them.

RP (Sept. 3, 2014) at 23.

The Singhs objected that the late disclosure violated the parties' discovery stipulation. The trial court observed that the Singhs had "a fair point," but deferred a final decision on the telephone records until the Grewals sought to introduce them at trial. RP (Sept. 3, 2014) at 23.

During Harbans' direct testimony about the events occurring in September 2009, counsel again sought to admit the telephone records "for this period of time we just discussed." RP (Sept. 10, 2014) at 858. Counsel explained that the telephone records were relevant to the parties' discussions that Harbans had been describing.

The trial court responded:

THE COURT: Are these just records showing a call made from a phone number to a phone number?

[COUNSEL]: Yes.

THE COURT: Well, my concern is that once we start letting things in that haven't been disclosed ahead of time without some -- two reasons. I mean, without some really good reason, I'm afraid I'm going to have to let everybody let everything in. And that sort of eviscerates the local rules, which I've been instructed by others not to do.

And second, I've heard testimony that there were numerous phone calls made and I'm willing to accept that. I haven't heard any contradiction of that, so -- and I'm not quite sure how seeing some records of phone calls from one number to another would deepen my understanding or really increase my knowledge.

I mean, I -- unless I hear testimony contradicting it, I'm -- it's undisputed that the parties negotiated between when they first met in July and then more urgently in September -- August and September.

> And they inked the deal, they signed a deal on November 14th. So all your points are made. I don't know if adding the exhibit is going to really help your record.
>
> [COUNSEL]: Okay. Thank you, Your Honor.

RP (Sept. 10, 2014) at 859.

On appeal, the Grewals claim that they offered the telephone records to refute the Singhs' claims that they repeatedly ignored telephone calls requesting payment for the Kent Valley LLC "throughout the spring of 2011." Br. of Appellant at 12. But the offer of proof at trial described the exhibits as involving only the period through September 2009, when the parties became acquainted and negotiated the initial agreement to purchase 50 percent of Kent Valley LLC. Counsel for the Grewals confirmed this period of time when he offered the exhibits during Harbans' testimony describing the same period.

As the trial court noted, there was no dispute that the parties had frequent contact during this period of time. Although the trial court referred to the late submission of the exhibits and a possible local rule violation, the court excluded the proposed exhibits primarily because they were cumulative, not as a sanction for a discovery violation. See Jones v. City of Seattle, 179 Wn.2d 322, 343, 314 P.3d 380 (2013) (late-disclosed testimony will be admitted "absent a willful violation, substantial prejudice to the nonviolating party, and the insufficiency of sanctions less drastic than exclusion"). Viewed in light of their offer of proof, the Grewals fail to demonstrate any abuse of discretion.

Motion to Reopen Case

The Grewals contend the trial court erred in refusing to reopen the case to permit a Bank of America bank manager to testify that the bank did not mark checks drawn on a closed account with an "account closed" stamp. They claim the evidence would have undermined Kamaljit's credibility and supported their trial testimony that Kamaljit had stolen and forged the check. "A motion to reopen a case for additional testimony is addressed to the sound discretion of the trial court, and the court's ruling will not be disturbed except for manifest abuse." Rogers Walla Walla, Inc. v. Ballard, 16 Wn. App. 81, 90, 553 P.2d 1372 (1976).

After considering the proposed testimony, the trial court denied the motion, concluding that the evidence would not have affected its decision. The Grewals suggest the court might have misunderstood the evidence as an attempt to establish that the bank account was not closed. We disagree.

The trial court was clearly aware that the Grewals were not attempting to prove the account was not closed. Moreover, any dispute about the validity of the "account closed" stamp was, at best, a minor collateral issue that would have had no effect on the court's ultimate assessment of the Grewals' credibility. As the court's extensive findings document, the credibility assessment rested on the Grewals' lengthy course of conduct in the transactions with the Singhs, evidence that constituted clear, cogent, and convincing evidence of fraud. The court did not abuse its discretion in refusing to reopen the case.

Attorney Fees

The Grewals contend that the trial court erred in awarding attorney fees totaling $324,056. They argue that the trial court failed to give due consideration to duplicative and unproductive work, excessive hours, and the attorneys' high hourly rate when determining the reasonableness of the fees. We review the reasonableness of an award for attorney fees for an abuse of discretion. Cook v. Brateng, 180 Wn. App. 368, 375, 321 P.3d 1255 (2014).

A determination of reasonable attorney fees generally begins with a calculation of the "lodestar," which is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate. See Mahler v. Szucs, 135 Wn.2d 398, 433–34, 957 P.2d 632, 966 P.2d 305 (1998). "The court should discount hours spent on unsuccessful claims, duplicated or wasted effort, or otherwise unproductive time." Chuong Van Pham v. Seattle City Light, 159 Wn.2d 527, 538, 151 P.3d 976 (2007).

In support of the attorney fee award, counsel for the Singhs submitted a detailed motion and affidavit documenting the fees incurred during the one and one-half years of litigation and seven-day trial. Counsel noted the difficult and highly contentious progress of the case, including difficulty of service of process, extensive discovery, pre-trial motions, work with experts, mediation, trial preparation, and motion for a receiver. The lead attorney's supporting affidavit set forth the attorneys' experience, hourly billing rates, and stated that the hourly rates, including the lead attorney's hourly rate of $395, were the standard rates charged other clients for similar matters and appropriate for the market. The motion included nearly 60 pages

of time records documenting the date, time billed, hourly rate, total amount, and detailed description of the work performed.

In opposing the motion for attorney fees, the Grewals did not dispute the reasonableness of the hourly rates for the Singhs' attorneys. Rather, they relied primarily on conclusory allegations that the hours expended were excessive given the relatively "straightforward" issues. CP at 1766. The Grewals' counsel claimed that he needed only one-third of the time that the Singhs' attorney spent on the case and that his hourly rate was $250.

In its ruling, the trial court noted that it had reviewed the extensive materials and the relevant factors in RPC 1.5(a). The court specifically identified as relevant factors the novelty and difficulty of some of the issues, including the "extraordinary amount of discovery and difficulties obtaining discovery," the amount at issue in the case, the need for interpreters, the higher burden of proof for certain claims, and the fact that Harbans' strategy was "to put the plaintiffs to strict proof on every factual issue and every legal issue." RP (Nov. 14, 2014) at 13, 12. The court also determined that the lead attorney's hourly rate was not "out of line with firms in the Downtown Seattle area" and that the rates were "customary" for the type of services. RP (Nov. 14, 2014) at 14. Finally, the trial court discounted the requested attorney fees by 5 percent, or $17,055, to address the Grewals' objections about possibly duplicative efforts. The discount was roughly comparable to the amount that the Singhs incurred for their unsuccessful summary judgment motion.

In summary, the record establishes that the trial court exercised its discretion on articulable grounds. See Eugster v. City of Spokane, 121 Wn. App. 799, 816, 91

P.3d 117 (2004). After considering the parties' arguments and the relevant factors in detail, the court concluded that the billed services "were reasonable or essential to the successful outcome." Mahler v. Szucs, 135 Wn.2d at 435. The court did not abuse its discretion in granting the Singhs' motion for attorney fees and costs.[3]

Affirmed.

WE CONCUR:

---

[3] On appeal, the Grewals challenges several specific entries on the billing records. Because these arguments are raised for the first time on appeal, we decline to consider them.