Anthony A. BUFORD, Jr.

v.

WILMINGTON TRUST
COMPANY, Appellant.

No. 87–1507.

United States Court of Appeals,
Third Circuit.

Argued Jan. 21, 1988.
Decided Feb. 25, 1988.

Lawrence J. Fox (argued), Lawrence A. Nathanson, Drinker, Biddle & Reath, Philadelphia, Pa., for appellant, Wilmington Trust Co.

David Berger, Robert P. Frutkin (argued), Nita M. Fandray, Berger & Montague, P.C., Philadelphia, Pa., for appellee, Anthony A. Buford, Jr.

Before GIBBONS, Chief Judge, WEIS and GREENBERG, Circuit Judges.

## OPINION

GIBBONS, Chief Judge:

In this diversity breach of contract action defendant Wilmington Trust Company (Wilmington) appeals from a judgment of $732,178.76 in favor of plaintiff Anthony A. Buford, Jr. (Buford). The contract in issue is an Agreement and Plan of Reorganization dated April 19, 1984, in which Buford, as seller, agreed to transfer all his stock in The Pennsylvania Group, Incorporated (Penn Group) to Wilmington in exchange for (1) Wilmington common stock having a fair market value of $600,000 at closing, and (2) additional Wilmington common stock, after closing, having a fair market value in an amount depending on Penn Group's future revenues. At issue is Wilmington's refusal to deliver the additional common stock. The jury found in Buford's favor on liability, and the district court entered judgment in his favor for the value, as of the date of the judgment, of shares withheld. Wilmington contends: (1) that the court erred in denying its motion for judgment notwithstanding the verdict or for a new trial; and (2) that the court erred in calculating damages based on the value of the stock on the date of the judgment rather than the date of the breach of contract. We will affirm the judgment in Buford's favor on liability, but reverse and remand for recalculation of the amount of the judgment.

## I.

At the time of the contract Buford owned all the stock of Penn Group, a Pennsylvania retail discount securities brokerage business conducted at Bala Cynwyd, Pennsylvania; Wilmington, a Delaware banking corporation, conducted a retail discount securities business, incident to its banking business, in Wilmington, Delaware, known as Wilmington Brokerage. Buford received $600,000 worth of Wilmington common stock at closing. Under paragraph 9.07 of the contract Wilmington agreed to give him additional shares if Penn Group had certain specified gross revenues in the fiscal years July 1, 1984–June 30, 1985 and July 1, 1985–June 30, 1986. The number of shares were to be determined by their market value on the payment date, which was the fifteenth business day after the end of the relevant fiscal period. The contract defined gross revenue of Penn Group as

... all commissions, syndicate fees, interest on balances, tender fees and other service, sales and administrative fees derived solely from the discount brokerage business to be acquired and operated by the Purchaser [Wilmington] (through a subsidiary) following the Closing from the current offices of the Discount Brokerage Business (or any additional or successor locations to which said discount brokerage business may expand or move during the period covered by this Section). Gross Revenues for any fiscal period shall be computed in accordance with generally accepted accounting principles.

To assure that Penn Group gross revenue would be properly calculated, paragraph 9.07 of the contract further provided:

(c) Purchaser [Wilmington] hereby represents and warrants to Seller [Buford] that Purchaser will not intentionally reduce, delay, divert to other offices or otherwise manipulate the amount of Gross Revenues in a manner intended to reduce the additional compensation to which Seller would be entitled hereunder.

(d) Purchaser agrees that for the fiscal year ending June 30, 1985, it will allocate not less than $40,000 of its advertising expenditures to promote the discount brokerage business acquired from Penn Group hereunder, and for the fiscal year ending June 30, 1986, Purchaser will allocate its discount brokerage advertising expenditures to the business acquired from Penn Group hereunder in an amount at least equal to the lessor of: (i) 50% of Purchaser's total discount brokerage advertising expenditures for the fiscal year ending June 30, 1986 or (ii) Purchaser's total discount brokerage advertising expenditures for the fiscal year ending June 30, 1986 multiplied by the percentage of Purchaser's discount brokerage gross revenues for the preceding fiscal year contributed by the business acquired from Penn Group hereunder.

It is undisputed that the gross revenues of Penn Group for the two specified fiscal years never reached the contract amounts which would trigger Wilmington's duty to deliver additional stock. Buford contends, however, that Wilmington breached the quoted undertakings with respect to diversion of revenue from and advertising expenditures for Penn Group, thereby intentionally reducing Penn Group's revenue. Buford contends that absent Wilmington's breach of contract the specified gross revenue levels would have been met, and the deferred payments of stock should have been made.

Following a four-day trial the district court submitted the case to the jury on interrogatories:

1. Did Wilmington Trust Company breach a contractual obligation to Anthony A. Buford, Jr. causing Mr. Buford harm?

2. State the amount, in dollars, of gross revenue which the Penn Group would have received had Wilmington Trust not breached the contract for the fiscal years 1985 and 1986.

Wilmington did not object to these interrogatories. The jury answered the first question affirmatively, and in answer to the second found that Penn Group's gross revenues absent the breach would have been $777,000 in fiscal 1985 and $976,000 in fiscal 1986. These amounts exceed the

gross revenues specified in the contract for Wilmington's obligation to deliver additional stock.

Following the verdict, Buford presented a calculation of damages based on the provisions of paragraph 9.07(a)(iv) of the contract, as amended, determined by the market value of Wilmington shares on June 30, 1987, the date of the jury's verdict. That valuation totalled $705,976. Buford also claimed lost dividends of $24,100.56 and interest on lost dividends of $2,102.20, or a total of $732,178.76. On July 1, 1987 judgment was entered in Buford's favor in that amount.

## II.

Wilmington made timely post trial motions for judgment notwithstanding the verdict, or in the alternative for a new trial. Both were denied. We review the denial of the motion for judgment notwithstanding the verdict by determining whether evidence was presented at trial upon which the jury could properly return a verdict for the party opposing the motion. *General Elec. Credit Corp. of Tenn. v. Ger–Beck Mach. Co.*, 806 F.2d 1207, 1208–09 (3d Cir. 1986); *Powell v. J.T. Posey Co.*, 766 F.2d 131, 133 (3d Cir.1985). Denials of new trial motions are reviewed for abuse of discretion. *Link v. Mercedes–Benz of N. Am., Inc.*, 788 F.2d 918, 921 (3d Cir.1986). In this case, however, Wilmington does not seriously urge that the evidence which was admitted does not support the verdict. Rather, its motion for judgment notwithstanding the verdict is predicated on alleged errors in the admission of evidence which, had it been excluded, would leave the verdict insupportable. Thus we first address Wilmington's objections to the admission of evidence.

■ Wilmington objects to the court's admission of evidence of brokerage business at Wilmington Brokerage for fiscal 1985 and 1986. Wilmington contends that this business was not relevant to the claim that it breached paragraph 9.07(b) of the contract because Wilmington Brokerage operated in a separate geographical region from Penn Group, and had a different business history. The disputed evidence about the business of Wilmington Brokerage was presented by Buford's expert, Feuchtwanger, who was extensively cross examined. Once the Fed.R.Evid. 401 low threshold of inference—"having any tendency to make the existence of any fact of consequence to the determination of the action more probable or less probable"—has been crossed, our review is for abuse of the discretion conferred on the trial court by Fed.R.Evid. 403. Clearly the testimony about increase in business at Wilmington Brokerage met the threshold test; it had a tendency to make it more probable that Wilmington diverted business from Penn Group. Wilmington was free to argue that its own evidence and the factors of geography and different business history suggested a different conclusion. We find no abuse of discretion in leaving to the jury the task of drawing appropriate inferences. *See Consumers Power Co. v. Curtiss–Wright Corp.*, 780 F.2d 1093, 1097 (3d Cir.1986) (it is the task of the jury to weigh the evidence).

■ Wilmington also contends that the court erred in permitting Buford to introduce in evidence a chart showing gross revenue figures for Wilmington Brokerage and Penn Group. The chart merely set forth relevant evidence otherwise admissible. It was at most cumulative. Its admission could not be a ground for a new trial. *Howmet Aluminum Corp. v. Hartford Accident & Indem. Co.*, 665 F.2d 476, 478 (3d Cir.1981).

■ Wilmington also contends that the court erred in admitting evidence about revenue produced by discount brokerage business generated from correspondent banks that did not operate their own discount brokerage business. This contention is predicated on the contract's definition of gross revenue, quoted in part I above. Wilmington urges that those revenues were not derived "solely from" the Penn Group business. But while Wilmington offered evidence suggesting that the correspondent bank business was derived from its own efforts, Buford's evidence suggested that Penn Group had a significant role

in developing the business. Thus the tests for Rule 401 relevancy and Rule 403 admissibility were satisfied, and the court properly permitted the jury to weigh the conflicting evidence.

None of Wilmington's objections to the court's evidentiary rulings have merit. The admitted evidence permitted the jury properly to return a verdict on liability in Buford's favor. Therefore the motion for a judgment notwithstanding the verdict was properly denied. What remains is the question whether, in light of Wilmington's objections to the jury instructions, a new trial may be required.

■ Wilmington produced evidence that it spent $44,071.38 in promoting Penn Group business. It sought a binding instruction that it had satisfied the obligation in paragraph 9.07(d) to allocate no less than $40,000 of its advertising expenditures to promote the Penn Group business. The court refused to give a binding instruction. That ruling was proper, for there was testimony by Buford's expert, Feuchtwanger, that some of the expenditures claimed by Wilmington were not what could commonly be understood to be "advertising" ... "to promote the discount brokerage business acquired." (Contract, ¶ 9.07(d)). For example, he testified that the expenditure of $4,200 to change a sign at the Bala Cynwyd location, while a marketing expenditure, was not an advertising expenditure. This expert's opinion is consistent with the apparent purpose of the undertaking in paragraph 9.07(d), namely to assure expenditures for the generation of new business. Thus the requested binding instruction was properly denied.

■ Alternatively, Wilmington requested an instruction that it was impermissible to employ an artificial definition of an expert who was not a party to the contract. The court also declined to give this instruction, but did instruct that "[y]ou may reject any expert witness' testimony entirely if you conclude that the reasons given in support of the opinion are unsound." The term "advertising expenditures to promote the discount brokerage business acquired" is not defined, and the parties to the contract dispute the term's intent. The trial court did not commit an abuse of discretion in permitting the jury to hear Feuchtwanger's interpretation and to make its own finding as to what was intended. The intention of the parties was in this respect a disputed issue of fact.

Wilmington urges that the court erred in refusing to give its requests for instructions No. 7 and No. 12, dealing with the jury's role in drawing inferences. The requests for instruction, as drawn, amounted to requests for a directed verdict on each of the critical factual issues in the case, and were properly refused. To the extent that we understand it, we find that request No. 13 suffers from the same defect.

Since there were no errors in the admission of evidence and no errors in the court's instructions to the jury, the motion for a new trial, like the motion for judgment notwithstanding the verdict, was properly denied.

## III.

In assessing Wilmington's objection to the damage calculation our starting point is the complaint, which pleads a classic action at law for damages for breach of contract. Thus we are not concerned with non-delivery of a block of Wilmington stock having such unique value, such as control, that specific relief might be appropriate. The securities in issue have a market price. The parties agree, moreover, that in this diversity case the appropriate reference is to Pennsylvania law. Our next inquiry, therefore, is the Pennsylvania law on the measure of damages for a seller's failure to deliver stock pursuant to a contract fully executed on the part of the buyer.

The Pennsylvania courts have addressed that question at least twice. In *Alexander v. Soulas*, 269 Pa. 423, 112 A. 538 (1921), it considered a contract for exchange of securities. Within a day one party to the contract reneged and the other sued for damages. The court held that "[t]he true measure of damages was ... the value of the securities the defendant agreed to deliver to plaintiff, less the value of the securities

plaintiff engaged to deliver the defendant, each being valued as of the date of the breach by the defendant." *Id.* at 426, 112 A. at 539. In *Wessel v. Montgomery, Scott & Co.,* 106 Pa.Super. 341, 350–51, 163 A. 347, 351 (1932), the court applied that damage rule to a seller's breach in failing to deliver bonds. The court addressed, as well, the interrelationship between contract and tort remedies, noting:

> It is urged that the refusal of defendants to deliver the bonds for which plaintiff had paid was a conversion and a tort for which the remedy was an action in trespass. If plaintiff had actually paid for the bonds and defendants failed and refused to deliver them, there was a breach of contract and plaintiff could sue in assumpsit. It is elementary law that where the same act is both a breach of contract and a tort the plaintiff may waive the tort and sue in assumpsit. That suit was on the contract and in affirmance of it. "When suit is brought on a contract and in affirmance of it, the verdict should make the plaintiff whole; that is, put him in as good a condition as if the contract had been performed." *Wilkinson v. Ferree,* 24 Pa. 190. Plaintiff claimed as damages the fair market value of the bonds, which he had paid for, at the time of the refusal of defendants to deliver them to him. This was the same amount as the price at which the bonds were bought by the plaintiff for him. The contract contemplated immediate delivery of the bonds and no question as to the effect of the rise or fall of the market upon the measure of damages is involved. In the circumstances this was the proper measure of damages. See *Wilkinson v. Ferree,* supra.

These authorities are an early vintage, but the parties have not called to our attention any more recent relevant Pennsylvania case. Our belief that the Pennsylvania Supreme Court would follow them today is reenforced by an examination of the provision in Article II of the Uniform Commercial Code setting forth the measure of a buyer's damages for a seller's breach of a contract to deliver goods. That measure is the difference between the contract price and the market price at the time when the buyer learned of the breach. UCC § 2–713; 13 Pa.Cons.Stat.Ann. § 2713 (Purdon 1984). The statutory sale of goods measure does not apply by its own terms, because the definition of goods excludes investment securities. UCC § 2–105(1); 13 Pa.Cons.Stat.Ann. § 2105(a) (Purdon 1984). In *In re Edwin J. Schoettle Co. Appeal,* 390 Pa. 365, 374, 134 A.2d 908, 913 (1957), the Pennsylvania Supreme Court observed:

> Under the Uniform Commercial Code— Sales, "investment securities"—that which was purchased and sold under this agreement—are expressly excluded. Comment 1 thereunder provides, inter alia: "'Investment securities' are expressly excluded from the coverage of this Article. It is not intended by this exclusion, however, to prevent the application of a particular section of this Article by analogy to securities ... when the reason of that section makes such application sensible and the situation involved is not covered by the Article of this Act dealing specifically with said securities (Art. 8)."

■ No reason has been suggested to us why the sale of goods measure is not an appropriate analogy. Thus, relying both on venerable Pennsylvania common law precedent and on a more modern Pennsylvania statute, we hold that the measure of damages for a seller's breach of a contract to deliver securities having a market value is the market value on the date the securities should have been delivered. To this sum must be added pre-judgment interest, consistent with the Pennsylvania law respecting damages for breach of contract. *See, e.g., Palmgreen v. Palmer's Garage, Inc.,* 383 Pa. 105, 108, 117 A.2d 721, 722 (1955) ("In all cases of contract interest is allowable at the legal rate from the time payment is withheld after it has become the duty of the debtor to make such payment; allowance of such interest does not depend upon discretion but is a legal right."); *Verner v. Shaffer,* 347 Pa.Super. 206, 211, 500 A.2d 479, 482 (1985) ("[I]n a contract action, the award of prejudgment

interest is not a matter of discretion, but is a legal right.").

It is clear, therefore, that the judgment in the amount of $732,178.76, predicated on the assumption that damages should be measured by market value at the date of the judgment, must be reversed.

### IV.

The jury's liability verdict is supported by the evidence and no reasons appear for the grant of a new trial. The liability judgment will therefore be affirmed. The judgment will be reversed, however, insofar as it awards $732,178.76 in damages, and the case remanded for a redetermination of damages based on the market value of Wilmington stock on the dates such stock should have been delivered, plus prejudgment interest from those dates.