**2021 UT App 113**

## THE UTAH COURT OF APPEALS

H&P INVESTMENTS, HOMER K. CUTRUBUS, AND PHIDIA CUTRUBUS,
Appellees,
*v.*
ILUX CAPITAL MANAGEMENT LLC, FORTIUS FINANCIAL
ADVISORS LLC, ROBERTO G. BUCHANAN, AND JEFF M. BOLLINGER,
Appellants.

Opinion
No. 20190548-CA
Filed October 28, 2021

Second District Court, Ogden Department
The Honorable Jennifer L. Valencia
No. 140907033

Troy L. Booher, Beth E. Kennedy, and Dick J.
Baldwin, Attorneys for Appellants

James C. Lewis and Chase Kimball, Attorneys
for Appellees

JUDGE DAVID N. MORTENSEN authored this Opinion, in which
JUDGES GREGORY K. ORME and MICHELE M. CHRISTIANSEN
FORSTER concurred.

MORTENSEN, Judge:

¶1      H&P Investments, Homer K. Cutrubus, and Phidia
Cutrubus (collectively, H&P) brought a claim for breach of
contract after it received 17,557 shares of Facebook stock, rather
than the 20,000 shares for which H&P believed it had contracted.
The claim was tried to the bench. The district court found in
H&P's favor, and its ruling on the merits is not challenged on
appeal. Instead, this appeal concerns various rulings related to
the damages the court awarded—central among them being the
court's conclusion about when H&P learned of the breach, which
determined the value of damages attributable to the missing

2,443 shares—along with its assessment of personal liability against two agents of the principal defendants, Fortius Financial Advisors LLC (Fortius) and iLux Capital Management LLC (iLux) (collectively, the Investment Companies). We reverse and remand.

## BACKGROUND

¶2　Facebook filed for an initial public offering (IPO) in February 2012, and it was "expected to be one of the largest in history." The Investment Companies learned of an opportunity to acquire shares of Facebook prior to the IPO but believed that to convince the owner to sell, they needed to be able to offer to purchase a substantial number of shares. They thought that combining money from numerous investors through a pooled investment vehicle would be an optimal way to do so.

¶3　To that end, they formed the iLux Secondary Market Fund LP (the Fund), with iLux acting as the general partner of the Fund and the investors acting as limited partners. The terms and conditions of investing in the Fund were contained in a lengthy private placement memorandum (PPM). The PPM indicated that the Fund was a vehicle for a variety of investments, not just Facebook, and thus any investor would be purchasing shares in the Fund rather than purchasing shares of Facebook (or any other particular stock). Other terms noted that each investor would have a "capital account," where each individual investor's funds would be placed, including each investor's contributions and pro-rata share of any stocks purchased or other proceeds generated. The PPM further specified that, unless waived by the general partner, there was a "one-year lockup period," meaning that investors had to wait one year from the time of their admission to the Fund before they could withdraw anything from their capital account.

¶4    In March 2012, Roberto G. Buchanan, an investment advisor with the Investment Companies, reached out to Homer Cutrubus (Cutrubus) to see if he would be interested in the opportunity to buy some Facebook shares. Cutrubus indicated that he was interested in purchasing 20,000 shares, depending on the price, through H&P, a company he owned with his brother, Phidia. After several communications, H&P committed to investing in April 2012 by tendering $868,140 to iLux and the Fund. However, H&P and the Investment Companies had different ideas about the terms of that investment.

¶5    For its part, H&P believed it was simply purchasing 20,000 shares of Facebook stock directly from the Investment Companies at a set price of $41.34 per share, along with a 5% management fee. Early on, Buchanan told Cutrubus that he thought the Investment Companies would strike a deal with a seller for $38 per share but that this was a "moving target." However, Buchanan eventually told Cutrubus that the Facebook shares had been "secured" and that H&P would have to commit to the purchase of 20,000 shares at that time. Buchanan specified that the price per share would be $41.34, for a total purchase price of $826,800, but that there would also be a 5% management fee of $41,340, for a total investment of $868,140. And when H&P tendered the $868,140 in two checks on May 7, 2012—the first for the purchase price and the second for the management fee—Phidia Cutrubus made a note on each check, reading,

First Check:

"20,000 SHARES of FACEBOOK
at 41.34 = 826,800.00"

Second Check:

"20,000 shares FACEBOOK
at 41.34 = 826,800.00.

826,800.00 x 5% = 41,340.00
TO COVER MANAGEMENT FEE"

¶6     On the other hand, the Investment Companies believed that H&P had simply signed on to be an investor in the Fund—meaning that H&P had contracted to receive only a pro-rata share of the stocks eventually acquired at whatever price. This belief was based on the fact that Buchanan had sent the PPM to H&P in the course of negotiations and, at some point during these discussions, Cutrubus signed the acknowledgment pages at the end of it.

¶7     The Investment Companies apparently had every intention of reaching an agreement with a seller to acquire Facebook shares at $41.34 per share, but this deal collapsed just days before Facebook's IPO occurred on May 18, 2012. The Investment Companies scrambled to find another seller and eventually locked in a sale and purchased a substantial number of Facebook shares. However, the price per share was not the anticipated $41.34, but was instead $47.02.

¶8     To make matters worse, after the IPO, Facebook's stock did not initially perform as anticipated. As a result, iLux sent various updates to investors of the Fund—including H&P—regarding the performance of the Facebook stock and related action the Fund was taking with respect to the stock. For example, in early November 2012, iLux sent an email indicating,

> Currently, [Facebook] is trading at approximately $22/share . . . . [Although] limited partners of the Fund were required to remain limited partners of the Fund for at least one year . . . , the General Partner has made the decision to distribute the shares of [Facebook] in-kind to all limited partners prior to the expiration of the [limited partner lockup period]. This will . . . give each limited

partner direct control over their pro rata shares of [Facebook] shares that the Fund purchased . . . . The General Partner intends to distribute all shares of [Facebook] in the Fund to the limited partners. In order to expedite the process, we ask that you provide us with the information to transfer your pro rata portion of [Facebook] shares to your brokerage account . . . .

¶9 On December 11, 2012, iLux sent H&P a follow-up letter with specifics about its investment. As is relevant, this letter stated,

> As an investor in the Fund, *your pro rata share of the in kind distribution is 17,557 shares*. . . . Please note that your capital account balance for Q2 and Q3 include your pro rata ownership of Facebook. Your Q4 capital account balance will reflect the distribution of the Facebook shares which will result in a corresponding decrease to your capital account balance. *For your records, the adjusted cost basis per share is $47.02.*

(Emphasis added.) Cutrubus immediately called Buchanan and told him that he wanted "all [H&P's] shares of stock, because [17,557 shares] was short" by 2,443 shares. Buchanan apparently responded that the 17,557 shares were the shares that were "available" but that "they were still distributing the shares, and they still had an audit before the capital accounts were settled." This answer did not "satisfy" Cutrubus; nevertheless, he came away with "the expectation that [H&P] would receive [its] shares." A few days later, H&P received the 17,557 shares mentioned in the letter.

¶10 In March 2013, Cutrubus again spoke to Buchanan over the phone about the remaining 2,443 shares. Cutrubus

apparently told Buchanan that H&P had "contracted to buy 20,000 shares, and it was . . . on [the] check, and just like any stock purchase, . . . if [the Investment Companies] weren't able to buy it for that, then they shouldn't have bought it because [H&P] only agreed to pay what [it] paid. And so [it] wanted . . . the balance of [its] shares." On March 20, Buchanan forwarded an email to Cutrubus from Jeff M. Bollinger (a manager at both Fortius and iLux) in an effort to provide "information on the questions [he] had." That email explained that iLux had found a seller at $42 per share in early March 2012, but that it was canceled by Facebook just prior to the IPO, and that iLux had then scrambled to find the eventual deal at $47.02 per share. Bollinger also stated, "As you know, we have sent out the shares of Facebook to all the Limited Partners in December. . . . We will be making the final capital account distributions on the 1 year anniversary, which is coming up in May."

¶11   Months later, on September 11, 2013, Bollinger sent Cutrubus another email to address his "questions on the share distribution" and about "any remaining cash" in H&P's capital account. The email went on to again explain how the original deal "was canceled by Facebook" and that iLux had to scramble to find another deal. That email also stated,

> We are in the process of closing out the fund and will be distributing the remaining cash to you. I am waiting to hear from the administrators the exact amount, it should be around $27,000 in addition to the 17,557 shares that were sent to you previously. You will be getting a final capital account statement shortly, and will have an independent audit performed for your review.

¶12   After reading Bollinger's email, on September 17, 2013, Cutrubus wrote a letter to Buchanan in response. In pertinent part, that letter stated,

> On numerous occasions we have discussed the fact that you have not forwarded all the shares [H&P] purchased in Facebook. . . .
>
> While [I] understand you had established [the Fund] to purchase these shares, please be reminded [H&P's] interest was solely in purchasing the shares of Facebook at the agreed price. That contractual understanding was clearly noted on the face of each of two checks.
>
> Therefore, [I] request you send [H&P] the additional 2,443 shares in Facebook that [H&P is] due. Additionally, because of the fact that this transaction was so mishandled, [I] also believe [H&P is] entitled to a refund of your management fee in the amount of $41,340.00.
>
> I would suggest you send the requested shares and check within the next ten days so that it will not be necessary for [me] to look to other avenues to make this recovery.

¶13 Cutrubus received a November 5, 2013 email from Bollinger in response. Essentially, Bollinger apologized for what he perceived to be a miscommunication between Buchanan and Cutrubus early on in their communications—Bollinger noted that while he understood that H&P's "sole intent" was to acquire Facebook shares, H&P "executed subscription documents for the investment into [the Fund] and *indirectly* into Facebook," and because "the investment in Facebook was indirect[,] the number of shares could not be specified by a limited partner's investments into" the Fund. In response to Cutrubus's demand, Bollinger stated,

> All Facebook shares have been sent out to each
> limited partner, based on the calculations of [the
> Fund's] independent third party fund
> administrator. The [Fund] *has not retained, nor holds*
> *any shares subject to distribution.*
>
> . . . .
>
> I appreciate your position on this matter and hope
> we can agree on a resolution . . . . [But we do] not
> have the financial wherewithal to fight this matter,
> nor are there funds in the [Fund] that could satisfy
> your demands.

¶14    On January 6, 2014, H&P's attorney sent a demand letter
to Bollinger and Buchanan, requesting that they "immediately
deliver" the outstanding 2,443 shares. Bollinger responded on
February 7, 2014, with a lengthy explanation about the Fund,
how the original deal had collapsed, and various other facts
previously relayed to Cutrubus.

¶15    Thereafter, H&P filed suit.

*The Court's Findings and Conclusions*

¶16    The central dispute at trial revolved around the terms of
the contract. Put simply, the dispute was whether H&P agreed to
be an investor in the Fund or if it instead agreed to purchase
shares directly from the Investment Companies. The district
court decided that the latter interpretation was correct. It
concluded that H&P never agreed to invest in the Fund because,
even though Cutrubus signed the PPM, he signed only three or
four loose signature pages and was never fully presented with
the PPM's terms. Instead, the district court concluded that the
terms of the parties' agreement were contained on the two May
7, 2012 checks, which "clearly and unambiguously set forth the

terms of the investment, namely 20,000 shares of [Facebook] at $41.34 per share with a management fee of $41,340" and that this contract was breached when the Investment Companies "failed to deliver the remaining 2,443 shares of [Facebook] stock purchased under the contract."

¶17    The district court then determined that H&P's damages for the nondelivery of the 2,443 shares was $172,915.54. In coming to this award, the district court first explained that damages for nondelivery of stock are determined by the value of the stock on the date that the buyer learned of the breach. The district court then found that H&P first learned of the breach on February 7, 2014, when Bollinger replied to the demand made by H&P's attorney. On this date, Facebook stock was valued at $64.32 per share, so the 2,443 shares would be valued collectively at $157,378.06.[1] However, the district court further determined that the "New York Rule" was applicable—meaning that the true measure of damages should be based on the "highest intermediate value of the stock" between February 7, 2014, and "a reasonable time after notice of the breach," which it found was February 28, 2014. (Cleaned up.) Within this extra twenty-one-day period, the highest value of Facebook's stock was $70.78 per share, so the district court used this value and arrived at the figure of $172,915.54 for the 2,443 shares.

¶18    But these were not the only damages that the district court awarded. It went on to determine that H&P was "entitled to reimbursement of the management fee of $41,340.00." Additionally, it concluded that H&P was entitled to a "distribution of [its] share of the capital account" in the Fund—

---

1. We note that this total was likely calculated incorrectly. The court apparently used a value of $64.42 per share instead of $64.32, making the total $244.30 too high. But no party has asked us to address this calculation.

which was around $27,000 based on Bollinger's testimony as to how much money was left in the capital account created for H&P. And not only were the Investment Companies adjudged to be liable for the damages, but the district court entered judgment against Buchanan and Bollinger in their personal capacities, because they were "at all times . . . listed individually as defendants in" the case.

¶19   This appeal followed.


## ISSUES AND STANDARDS OF REVIEW

¶20   Appellants first take issue with the district court's ultimate decision to award $172,915.54 in damages for the missing 2,443 shares. Specifically, they contend that the district court erred in finding that H&P did not learn of the breach until February 7, 2014. This challenge relates to a factual finding, which we will not overturn "unless it is clearly erroneous or against the clear weight of the evidence." *Jacob v. Bate*, 2015 UT App 206, ¶ 15, 358 P.3d 346. They also contend that the district court erred by applying the New York rule in assessing the measure of damages. This presents "a question of law that we review for correctness." *See Mahana v. Onyx Acceptance Corp.*, 2004 UT 59, ¶ 25, 96 P.3d 893.

¶21   Appellants next take issue with the two other categories of damages that the district court awarded to H&P. As to refunding the management fee, they argue that the district court erroneously awarded rescission damages on the underlying contract that it had just enforced. This, too, presents "a question of law that we review for correctness." *See id.* As to the capital account distribution, they contend that there was simply no basis for this award and that it would only be available had the district court found that the PPM was the operative agreement between the parties. However, they concede that this particular

contention was not preserved and therefore ask us to review it for plain error.[2] "To obtain relief via the plain-error doctrine, an appellant must show the existence of a harmful error that should have been obvious to the district court." *Thomas v. Mattena*, 2017 UT App 81, ¶ 9, 397 P.3d 856 (cleaned up).

¶22 Appellants lastly contend that the district court erred in concluding that Buchanan and Bollinger were personally liable for the damages. This presents a legal question that we review for correctness. *See Standard Fed. Sav. & Loan Ass'n v. Kirkbride*, 821 P.2d 1136, 1137 (Utah 1991) (noting that where "the facts are not in dispute" and "[t]he trial court made its ruling based on its interpretation of the law," an appellate court reviews such a ruling for correctness).

ANALYSIS

I. Damages for Outstanding Shares

A.      Date H&P Learned of the Breach

¶23 In determining the measure of damages for the outstanding 2,443 Facebook shares, the district court concluded that the proper measure of damages "is the difference between the market price at the time when the buyer learned of the breach and the contract price." *See* Utah Code Ann. § 70A-2-

---

2. "Our supreme court has recognized the ongoing debate about the propriety of civil plain error review, but has not yet taken the opportunity to resolve that debate for purposes of Utah law." *Miner v. Miner*, 2021 UT App 77, ¶ 11 n.3 (cleaned up). Because neither party challenges the application of plain error review in this case, we apply it "without opining on the propriety of that review." *See id.*

713(1) (LexisNexis 2009). In addition to determining that this was the governing law, the district court found that H&P did not learn that the Investment Companies had breached the contract until February 7, 2014. At that point in time, Facebook stock was valued at $64.32 per share. Appellants argue that H&P learned of the breach as many as fourteen months earlier, which matters because between these dates "the value of Facebook shares skyrocketed from $27.98 to $64.32," resulting "in an excess award of $88,778.62" on the outstanding 2,443 shares.

### 1. Applicability of Section 70A-2-713

¶24 However, before we get to Appellants' arguments, we are compelled to address the district court's underlying conclusion that the proper measure of damages in this case was governed by Utah Code section 70A-2-713(1).[3] This is so because this particular statute comes from Article 2 of the Uniform Commercial Code (U.C.C.)—which deals specifically with the sale of goods and expressly indicates that the sale of stocks is not within its ambit. *See* Utah Code Ann. § 70A-2-105(1) (LexisNexis 2009) (defining the term "goods" and indicating that it does not include "investment securities"); *see also* U.C.C. § 2-105 cmt. 1 (Am. L. Inst. & Unif. L. Comm'n 2021) ("'Investment securities' are expressly excluded from the coverage of this Article.").

---

3. Neither party has challenged the district court's application of this statute, instead focusing solely on the court's finding regarding the date of breach. However, the statute itself raises an obvious question as to its applicability where—as is the case here—the breach concerns the nondelivery of stock. *See Buford v. Wilmington Trust Co.*, 841 F.2d 51, 56 (3d Cir. 1988) ("The statutory sale of goods measure does not apply by its own terms, because the definition of goods excludes investment securities."). So to prevent any confusion moving forward, we address whether the statute should be applied in such a scenario.

Instead, stocks are provided for in Article 8. *See* U.C.C. § 8-101 (Am. L. Inst. & Unif. L. Comm'n 2021). *See generally* Utah Code Ann. §§ 70A-8-100 to -601 (LexisNexis 2009).

¶25     In reaching its conclusion that this statute was applicable, the district court correctly noted that in *Coombs & Co. of Ogden v. Reed*, 303 P.2d 1097 (Utah 1956), our supreme court expressly held that "the measure of damages for failure to deliver stock in breach of a contract of sale" is "the difference in contract price and market price at the time of the refusal to deliver," if no time for delivery was designated in the contract. *See id.* at 1098–99. This holding was rather straightforward, in that the *Coombs* court simply "interpreted literally" the governing statute in effect at the time: Utah Code section 60-5-5(3), which was a provision of the Uniform Sales Act. *See Coombs*, 303 P.2d at 1097–98. But, as the district court noted, "Section 60-5-5 referenced in *Coombs* was repealed and replaced by § 70A-2-713." Consequently, the district court concluded that section 70A-2-713 should be applied, while reasoning that it "does not represent a departure from" the rule in *Coombs* but is instead merely "a refinement" of it. We do not disagree that the statute applied in *Coombs* and section 70A-2-713 are extremely similar, but the question remains as to whether section 70A-2-713 is the proper standard given its placement within Article 2 of the U.C.C.

¶26     Like other courts to address the question, we ultimately agree with the district court that section 70A-2-713 provides the proper measure of damages under the circumstances presented here. As explained above, Article 2 expressly excludes from its coverage investment securities, which are instead provided for in Article 8. *See, e.g.*, *Peters v. Richwell Res., Ltd.*, 824 P.2d 527, 531 (Wash. Ct. App. 1992) ("[I]nvestment securities are specifically *excluded* from article 2 and specifically *provided for* in article 8 . . . ."). With that said, the official comments to Article 2 go on to explain that provisions therein may apply "by analogy to

securities" if "such application [is] sensible and the situation involved is not covered by" Article 8. *See* U.C.C. § 2-105 cmt. 1; *see also Power Sys. & Controls, Inc. v. Keith's Elec. Constr. Co.*, 765 P.2d 5, 10 n.3 (Utah Ct. App. 1988) (explaining that official comments to the U.C.C. "are by far the most useful aids" in interpreting Utah's U.C.C. provisions (cleaned up)). Noting this language, along with the fact that Article 8 is indeed silent on the measure of damages for the nondelivery of stock, other courts have applied their state's respective versions of section 70A-2-713 to the sale of stock. *See Peters*, 824 P.2d at 531 ("We see no reason, nor has one been suggested to us, why the sale of goods measure should not be applied by analogy under the facts presented."); *Buford v. Wilmington Trust Co.*, 841 F.2d 51, 56 (3d Cir. 1988) ("[W]e hold that the measure of damages [under Pennsylvania law] for a seller's breach of a contract to deliver securities . . . is the market value on the date the securities should have been delivered.").

¶27    We see no reason to depart from the sensible approach adopted by these courts. Under section 70A-2-713, a buyer who was aware of breach and could have—but did not—"cover" by purchasing a replacement good, is simply entitled to the difference between the contract price and the market price at the time the buyer should have covered, i.e., when it learned of the breach. *See* Utah Code Ann. §§ 70A-2-712 to -713 (LexisNexis 2009); U.C.C. § 2-713 cmt. 1 (Am. L. Inst. & Unif. L. Comm'n 2021). While the rule is specifically intended to apply to the sale of goods, we agree that it is equally sensible to apply it to publicly traded stocks that can be purchased on an open market. *See Peters*, 824 P.2d at 532 ("Since the stock was publicly traded, once [the plaintiff] learned of the breach [the plaintiff] could have covered by acquiring the stock on the open market."); *see also Coombs*, 303 P.2d at 1098 (noting that the purpose of the predecessor statute was to prevent a contracting party from gambling on changing market conditions). With this in mind, we

move on to an analysis of the district court's findings regarding the date H&P learned of the breach.

### 2. The District Court's Finding Regarding When H&P "Learned" of the Breach

¶28    In contending that the district court erred in finding that H&P did not learn of the breach until February 7, 2014, Appellants specifically assert two earlier alternative dates on which the district court was required as a matter of law to find that H&P learned of the breach. The first of these dates is December 11, 2012, which Appellants frame as an objective measure by which any reasonable person would have known of the breach. The second of these dates is November 5, 2013, which Appellants frame as a subjective measure and assert that H&P was unquestionably aware of the breach by this date.[4]

¶29    The district court found that H&P was not "on notice" that it "would not receive the remaining 2,443 shares" prior to Bollinger's February 7, 2014 response to the demand letter drafted by H&P's attorney. In coming to this finding, the district court appeared to credit Cutrubus's testimony that for some time, he maintained a belief that H&P would receive the outstanding shares based primarily on verbal communications from Buchanan. Specifically, the court relied on the multiple communications in which Buchanan responded to Cutrubus's concerns about the missing shares by telling him that a final distribution would be made after an audit of the capital accounts took place—from which Cutrubus inferred that H&P would

---

4. During oral argument, Appellants additionally argued that Cutrubus learned of the breach in March 2013. We decline to address this argument because it was never meaningfully developed in the briefs. *See State v. Kitches*, 2021 UT App 24, ¶ 39 n.4, 484 P.3d 415.

receive its shares once the audit and resulting final account distribution occurred.

¶30 We will not set aside the district court's finding of fact unless Appellants demonstrate that the finding is clearly erroneous. *See Levin v. Carlton-Levin*, 2014 UT App 3, ¶ 12, 318 P.3d 1177; *Save Our Schools v. Board of Educ.*, 2005 UT 55, ¶¶ 9–10, 122 P.3d 611. And it is not enough to simply demonstrate "[t]hat another fact-finder might have reached different factual findings based on the evidence." *Levin*, 2014 UT App 3, ¶ 12. Instead, the Appellants must demonstrate that the finding is not "adequately supported by the record," even after "resolving all disputes in the evidence in a light most favorable to the trial court's determination." *Save Our Schools*, 2005 UT 55, ¶ 9 (cleaned up).

¶31 Appellants first argue that the district court should have instead found that Cutrubus was aware of the breach on December 11, 2012, based on the contents of the letter sent to him by iLux on that date. *See supra* ¶ 9. They assert that knowledge of breach should be determined, as with the running of the statute of limitations under our discovery rule, by when H&P learned of *or should have learned* of the breach. (Citing *Colosimo v. Roman Cath. Bishop of Salt Lake City*, 2004 UT App 436, ¶ 20, 104 P.3d 646, *aff'd*, 2007 UT 25, 156 P.3d 806.) From this, they argue that Cutrubus should have learned of the breach upon reading the December 11, 2012 letter because that letter stated "that he would receive 17,557 shares (not 20,000), and the price would be $47.02 per share (not $41.34)," which "contradicted the terms of the contract that the district court found to be operative."

¶32 We do not agree that the district court was obligated to find that H&P learned of the breach on December 11, 2012. As an initial matter, we note that the district court expressly acknowledged the contents of the December 11 letter. But it then went on to find that this letter was the first of multiple instances in which Cutrubus discussed the outstanding shares with

Buchanan and inferred that H&P would still receive them. Specifically, the district court found that Cutrubus called Buchanan upon reading the letter and "told him that he wanted delivery of the remaining 2,443 shares," to which Buchanan responded "that there was an audit and there would be a final distribution with the capital account."

¶33　These findings about the subsequent conversation and the evidence supporting them belie any notion that the district court clearly erred by rejecting December 11, 2012, as the date that Cutrubus learned of the breach. Appellants' argument boils down to an assertion that Cutrubus "should have" *inferred*, based on the information in the December 11 letter, that H&P would not receive the remaining 2,443 shares. Yet Appellants fail to acknowledge that upon receipt of this information, Cutrubus immediately called Buchanan—the representative of the Investment Companies with whom Cutrubus had been working and communicating exclusively up to this point—and pointedly told him that he expected H&P would receive the remaining shares. Rather than simply tell Cutrubus that H&P would not be receiving any more shares, Buchanan instead told him that they were still "distributing the shares" and that there would be "a final distribution with the capital account." Assuming for the sake of argument that the proper inquiry is whether a reasonable person should have been aware of a breach, given the context of the communication, it was not unreasonable for Cutrubus to infer from Buchanan's statements that H&P would still receive the 2,443 shares at a later date. Said another way, the district court was not limited to finding that H&P should have covered on December 11, 2012. *Cf. Moses v. Archie McFarland & Son*, 230 P.2d 571, 575 (Utah 1951) (noting that it is particularly reasonable for the buyer to forgo covering where there is "assurance from the seller that proper performance will soon be rendered").

¶34　Appellants next argue that the district court should have found that H&P learned of the breach on November 5, 2013.

They assert that Cutrubus testified that he subjectively understood that H&P would not receive the outstanding shares as of this date. And therefore Appellants assert that by Cutrubus's own admission, the district court erred in finding that H&P did not learn of the breach until approximately three months later.

¶35 The following is the testimony to which Appellants refer. At trial, Cutrubus was asked, "When did you first conclude that you weren't going to get the 20,000 shares?" Cutrubus testified that when he sent his September 17, 2013 demand letter to Bollinger, he "didn't know what the game was going on down there, but [he] felt that they had a brokerage account there—they had the stocks somewhere." However, Cutrubus's "expectation that [H&P] would get the remainder of [its] 20,000 shares change[d]" when he received Bollinger's reply on November 5, 2013. Indeed, at that time, Cutrubus "conclude[d]" that "we got what we got, and they were not going to deliver the balance of what we agreed to."

¶36 We agree with Appellants that based on Cutrubus's own testimony, the district court clearly erred in concluding that H&P learned of the breach after November 5, 2013. By his own admission, Cutrubus was aware that H&P was not going to receive any more shares—therefore, H&P should have covered by that date. In the face of such unequivocal testimony about his own state of mind,[5] there is "insufficient evidentiary support,"

---

5. H&P argues that Cutrubus still believed H&P would receive the outstanding shares and that this testimony is essentially being taken out of context. However, the only support H&P provides for this argument is the fact that "just a moment later," Cutrubus testified that—in an earlier conversation with Buchanan—Buchanan did not explicitly tell Cutrubus that H&P would not receive the shares and that this conversation with

(continued…)

*see Newton v. Stoneridge Apartments*, 2018 UT App 64, ¶ 19, 424 P.3d 1086, for the district court's contrary finding that H&P was not "on notice" that it "would not receive the remaining 2,443 shares" until months later. On this basis, the district court's finding was clearly erroneous.

¶37    Accordingly, we reverse and remand. On remand, the district court should amend its finding regarding the date that H&P learned of the breach to November 5, 2013. It should then make a finding as to the precise value of Facebook shares as of that date and amend the damages attributable to the undelivered 2,443 shares commensurate with this finding.

B.      Application of the New York Rule

¶38    Appellants' next and related assignment of error concerns the fact that the district court, after determining that H&P did not learn of the breach until February 7, 2014, used an even later date to calculate damages. Specifically, the district court concluded that damages should be calculated as of February 24, 2014. The district court's selection of this latter date was based on its application of "the New York rule, which sets the measure of damages as the highest intermediate value of the stock between the time of conversion and a reasonable time after the owner receives notice of the conversion." *See Broadwater v. Old Republic Surety*, 854 P.2d 527, 531 (Utah 1993). Appellants argue

_____

(…continued)
Buchanan happened "in the context of [Cutrubus's] efforts to get delivery of the remaining 2,443 shares." But this simply speaks to Cutrubus's belief *at an earlier point in time*. It does not contradict or clarify Cutrubus' clear testimony as to his state of mind when he received Bollinger's response to H&P's demand letter.

that the district court erred because the New York rule "applies only in conversion cases."

¶39     In applying the New York rule, the district court noted that Utah courts have applied it only in the context of conversion claims. But the district court went on to explain that it believed it to be an open question as to whether the rule could be applied to breach of contract claims. It resolved this apparent uncertainty in favor of applying the rule in this case, reasoning that what happened here was "analogous to a conversion" because H&P was "denied the benefits of ownership and use of an asset [it] had purchased" and had "consistently and repeatedly asked for."

¶40     We start by noting that the district court was correct in its acknowledgment that Utah courts have applied the New York rule only in the context of conversion of shares. *See, e.g.*, *Ockey v. Lehmer*, 2008 UT 37, ¶ 47, 189 P.3d 51 (noting that the New York rule was applicable to a breach of fiduciary duty claim because that claim arose from the defendant's "conversion of the stock" and thus "share[d] the same operative facts"); *Broadwater*, 854 P.2d at 531–33 (applying the rule in reviewing the damages awarded for conversion of stock); *Western Sec. Co. v. Silver King Consol. Mining Co. of Utah*, 192 P. 664, 672 (Utah 1920) (noting the applicability of the rule if the defendant "was guilty of conversion of the stock"). And this makes sense, given that the New York rule was adopted as an exception to the general rule for measuring conversion damages—which would instead award the plaintiff "the value of the property at the time of the conversion, plus interest"—because the general rule provides an inadequate remedy "when the property converted, such as stock, fluctuates in value." *See Broadwater*, 854 P.2d at 531.

¶41     The district court erroneously concluded, however, that it remained an open question whether the New York rule could be applied in Utah to a breach of contract claim. In coming to this

conclusion, the district court appeared to largely rely on *Kearl v. Rausser*, 293 F. App'x 592 (10th Cir. 2008), an unpublished decision in which the Tenth Circuit opined that some "jurisdictions have applied the so-called 'New York' rule of damages to actions involving . . . a breach of contract to deliver stock, and it is at least possible Utah would do the same." *Id.* at 605. But this assessment was simply incorrect. In *Lake v. Pinder*, 368 P.2d 593 (Utah 1962), our supreme court held that "the rule . . . that in case of a conversion of fluctuating stock, the owner, who is deprived thereof, is entitled to be repaid the highest market value of such stock within a reasonable time thereafter"—i.e., the New York rule—"is not applicable . . . where there was no conversion of plaintiff's stock." *See id.* at 594–95 (citing *Western Sec. Co.*, 192 P. 664). Indeed, the *Lake* court's holding came in the specific context of rejecting the plaintiff's argument that the New York rule should be applied to his breach of contract claim, which concerned the "failure to deliver 31,000 shares" of stock. *See id.* at 593. Binding precedent from our supreme court has thus long foreclosed the possibility of applying the New York rule to breach of contract claims, and therefore the district court erred by doing so.

¶42 Curiously, H&P urges us to resist this conclusion. It argues that because *Kearl* says that the question remains open, we should follow the unpublished pronouncements of the Tenth Circuit, and we should ignore our supreme court's directives in *Lake* because it is a short opinion that has not been often cited. But as we are quite certain that no page-quantum-threshold requirement to stare decisis exists, we decline the invitation. *See, e.g., Ortega v. Ridgewood Estates LLC*, 2016 UT App 131, ¶ 30, 379 P.3d 18 ("We are bound by vertical stare decisis to follow strictly the decisions rendered by the Utah Supreme Court." (cleaned up)); *Doyle v. Lehi City*, 2012 UT App 342, ¶ 27, 291 P.3d 853 ("We are not bound, however, by decisions of the Tenth Circuit . . . ."). On remand, the district court should not apply the New York

rule when reassessing the damages attributable to the 2,443 shares.

## II. Other Damages Awarded

¶43    Appellants contend that the district court further erred by awarding as damages (a) "reimbursement of the management fee of $41,340.00" and (b) "distribution of [H&P's] share of the capital account," which was approximately $27,000. Specifically, they argue that these awards violated the election of remedies doctrine in that they are "factually inconsistent with the court's ruling that the May 7 contract was operative" and "amount to double recoveries." But they also recognize that insofar as the unpreserved issue regarding the capital account distribution goes, they must do more than show that the district court committed error—they must also show plain error, meaning "that the error should have been obvious to the trial court." *See State v. Marquina*, 2018 UT App 219, ¶ 27, 437 P.3d 628 (cleaned up), *aff'd*, 2020 UT 66, 478 P.3d 37.[6]

¶44    In *Helf v. Chevron U.S.A. Inc.*, 2015 UT 81, 361 P.3d 63, our supreme court discussed the election of remedies doctrine in great detail. *See id.* ¶¶ 68–86. The *Helf* court explained that the election of remedies doctrine is a "straight-forward principle," which "applies to prevent the [plaintiff] from obtaining a double recovery or recovering two inconsistent remedies." *Id.* ¶¶ 70, 85. Describing how the doctrine prevents double recoveries, the *Helf*

---

6. Plain error also requires a showing of prejudice. *See State v. Marquina*, 2018 UT App 219, ¶ 27, 437 P.3d 628, *aff'd*, 2020 UT 66, 478 P.3d 37. However, there is no dispute that if the district court erred, the error was prejudicial, given the essentially undisputed testimony at trial that H&P's capital account in the Fund contained approximately $27,000. Thus, we do not discuss this element further.

court explained, by way of example, that a plaintiff who sues a defendant for wrongfully retaining possession of a cow "may not recover both the cow *and* the reasonable value of the cow" but must instead "elect one of these two remedies." *Id.* ¶ 68. The *Helf* court then went on to describe how the doctrine prevents the plaintiff from recovering inconsistent remedies for "a single wrong." *See id.* ¶¶ 69–70; *see also id.* ¶¶ 71–86. It explained that, while "a plaintiff may present inconsistent theories of liability at trial," when the "factual and legal disputes related to the inconsistent theories of liability" have been resolved, "the plaintiff is then entitled to the one remedy (if any) that is supported by the final determination of the law and the facts." *See id.* ¶ 76. The *Helf* court also explained,

> One common example of the application of this rule occurs when a plaintiff is not paid for services rendered to a defendant. The plaintiff may either recover damages for breach of contract or, if no valid contract governs the services provided, the plaintiff may recover the reasonable value of the services under a quantum meruit claim. Because a breach of contract remedy requires a valid, enforceable contract, while a quantum meruit remedy presupposes that no contract governs the services provided, a plaintiff may recover only one of these two inconsistent remedies.

*Id.* ¶ 69 (cleaned up). Turning to the issue before it, the *Helf* court provided another example of this rule in application. *See id.* ¶ 78. It explained that "[a] worker injured on the job may potentially recover either worker's compensation benefits or intentional tort damages" and that "[t]hese two remedies are inconsistent" because the former requires a showing that the injury was caused by an accident, whereas the latter requires a showing that it was caused by an intentional tort. *See id.* It concluded that it was for the fact-finder to decide whether the injury was caused

by an accident or an intentional tort and that this determination would then dictate the sole remedy to which the worker was entitled. *See id.* ¶¶ 76, 86.

¶45    As noted above, the principal dispute at trial in the case before us centered on the terms of the operative contract. *See supra* ¶ 16. The district court concluded that the PPM, under the circumstances, did "not meet the basic requirements to constitute a contract" because Cutrubus was never aware of its terms and signed only a loose signature page containing no terms. On the other hand, it determined that Cutrubus "did enter into a binding contract" with the Investment Companies "on May 7, 2012" and that "[t]he investment checks clearly and unambiguously set forth the terms of the investment, namely 20,000 shares of [Facebook] at $41.34 per share *with a management fee of $41,340.*" (Emphasis added.) Accordingly, the court concluded that this contract was breached when the Investment Companies "failed to deliver the remaining 2,443 shares of [Facebook] stock purchased under the contract" and that Cutrubus was therefore entitled to enforce the contract and collect expectation damages: awarding the "[d]ifference in contract price and market price" of the shares at the time Cutrubus learned of breach.[7] *See Trans-Western Petroleum, Inc. v. United States Gypsum Co.*, 2016 UT 27, ¶ 14, 379 P.3d 1200 ("This expectation interest is generally measured by . . . the loss in the value of the other party's performance caused by its failure or deficiency . . . ." (cleaned up)). But when the court went further and awarded a refund of the management fee and the capital account distribution, it provided additional inconsistent awards that violated the election of remedies doctrine.

---

7. Albeit, as we have already discussed, it erroneously applied the New York rule in calculating the damages.

¶46    As to the management fee, this award was plainly inconsistent with the enforcement of the May 7, 2012 checks as the operative contract. As explicitly noted in the court's own findings, "a management fee of $41,340" was a part of that contract. So in refunding that fee, the court erroneously provided damages associated with rescission of the contract on top of its previous award of expectation damages for breach of contract.[8] *Cf. Helf*, 2015 UT 81, ¶ 69 (explaining that awarding a breach of contract remedy along with a quantum meruit remedy would violate the election of remedies doctrine); *Mills v. Brown*, 568 S.W.2d 100, 102 (Tenn. 1978) ("Rescission, of course, involves the avoidance, or setting aside, of a transaction. Usually it involves a refund of the purchase price or otherwise placing the parties in their prior status."); *Davis v. Cleary Bldg. Corp.*, 143 S.W.3d 659, 669 (Mo. Ct. App. 2004) ("In electing rescission, which depends on rejection of the contract as written, the [plaintiff] could not also obtain actual damages on the contract, as an award of actual damages depends on affirmation of the contract." (cleaned up)). In other words, the district court erred by granting a discount on the very contract it purported to enforce—effectively putting H&P in a *better* position than it would have been had the contract simply been performed. *See Telegraph Tower LLC v. Century Mortgage LLC*, 2016 UT App 102, ¶ 46, 376 P.3d 333 ("Contract damages . . . are intended to . . . put

---

8. H&P resists our conclusion by positing that, in refunding the management fee, the district court could have intended to award incidental or consequential damages, which would be consistent with expectation damages. *See Trans-Western Petroleum, Inc. v. United States Gypsum Co.*, 2016 UT 27, ¶¶ 14–18, 379 P.3d 1200. But H&P has failed to articulate how refunding part of the purchase price of a contract could constitute incidental or consequential damages—perhaps because this would be an impossible task.

[the claimant] in as good a position as he would have been in had the contract been performed." (cleaned up)).

¶47    As to the capital account distribution, this award was inconsistent with the court's conclusion that H&P never agreed to the PPM, and was therefore never an investor in the Fund. The district court appeared to premise this award on the notion that, despite several communications from Buchanan and Bollinger to Cutrubus referencing the final capital account distribution, H&P had never received what remained in its capital account. But it was the PPM itself which provided for the creation of a capital account for each investor—the Fund created a capital account for H&P, as it did for all other investors, because it was operating under the assumption that H&P had agreed to become an investor of the Fund after Cutrubus had signed the PPM. So when the court found that H&P never contracted to be a party to the PPM but only to buy 20,000 Facebook shares, it was precluded from awarding damages to H&P that H&P would have been entitled to only if H&P had been a party to the PPM. In other words, as accurately stated by Appellants, "[u]nder [H&P's] prevailing theory [of which contract was operative], there were never any funds remaining to be placed in a capital account—the entire amount of their investment should have been used to purchase shares" and pay the 5% management fee. So again, the district court's award had the effect of putting H&P in a better position than it would have been had the May 7, 2012 contract simply been performed.

¶48    But we must also determine whether the error in awarding the capital account distribution should have been obvious to the district court. "An error is obvious when the law governing the error was clear at the time the alleged error was made." *In re J.C.*, 2016 UT App 10, ¶ 20, 366 P.3d 867 (cleaned up). We conclude that the error should have been obvious. First, as already alluded to, the election of remedies doctrine's ban on inconsistent awards was clear at the time this error was made.

*See supra* ¶ 44; *see also Help*, 2015 UT 81, ¶ 76 (explaining that under "the modern view . . . a plaintiff may present inconsistent theories of liability at trial" but is "entitled to the one remedy (if any) that is supported by the final determination of the law and the facts"); *see also KTM Health Care Inc. v. SG Nursing Home LLC*, 2018 UT App 152, ¶ 68, 436 P.3d 151 (reiterating that a plaintiff may "pursue inconsistent theories at trial" but that the sole remedy is determined once the fact-finder resolves the factual inconsistencies). Second, when H&P asked for a distribution of the capital account in its closing argument, that request was specifically framed as an inconsistent theory of liability, i.e., that it should be awarded *only if* the court were to find that the PPM was the controlling contract:

> Let me turn to damages for a moment. . . . First one, I think I mentioned at the outset of this case, that's the capital account. . . . I think it's well established through the testimony that . . . the general partner and Mr. Bollinger have not met their obligation under the [PPM], *if the [c]ourt in fact finds that that agreement, in fact, is a contract given the circumstances I've described*. Mr. Bollinger represented beginning in September that there was going to be a final capital distribution, he estimated [H&P's] amount to be $27,000. . . . We believe that is a breach of contract.

(Emphasis added.) Based on the foregoing, the district court should have been well aware, given its findings that the May 7, 2012 contract memorialized by the checks was operative and that H&P never agreed to the PPM, that it could not award as damages a distribution of the capital account. *See Vanderzon v. Vanderzon*, 2017 UT App 150, ¶ 50, 402 P.3d 219 (holding that an "error should have been obvious based on the court's own findings").

### III. Personal Liability

¶49 Finally, Appellants contend that the district court erred in entering judgment against Buchanan and Bollinger in their personal capacities. They argue that because "the court's findings recognize" that Buchanan and Bollinger "only acted on behalf of the LLCs," i.e., the Investment Companies, it was error to hold them personally liable for damages stemming from the Investment Companies breaching the May 7 contract.

¶50 "A debt, obligation, or other liability of a limited liability company is solely the debt, obligation, or other liability of the limited liability company." Utah Code Ann. § 48-3a-304(1) (LexisNexis 2015). Therefore, "[a] member or manager is not personally liable, directly or indirectly, by way of contribution or otherwise, for a debt, obligation, or other liability of the limited liability company solely by reason of being or acting as a member or manager." *Id.* Instead, a member or manager of a limited liability company may be held "personally liable for his [limited liability company's] contractual breaches [if] he assumed personal liability, acted in bad faith or committed a tort in connection with the performance of the contract." *Reedeker v. Salisbury*, 952 P.2d 577, 582 (Utah Ct. App. 1998) (cleaned up); *accord Dygert v. Collier*, 2004 UT App 25U, para. 2.

¶51 The district court erred in entering judgment against Buchanan and Bollinger in their personal capacities. Indeed, the district court's own findings preclude such liability—it specifically found that H&P "enter[ed] into a binding contract with Fortius and [iLux] on May 7, 2012," acknowledged that Buchanan and Bollinger were members and managers of the LLCs, and that they acted only as agents for the two LLCs.

¶52 H&P recognizes this and thus concedes that it is "barred from a claim of personal liability on a contract claim against Buchanan and Bollinger individually by reason of acting as a

member or manager." Nevertheless, H&P speculates that the district court's entry of personal liability *might* be based on the court concluding that Bollinger and Buchanan committed a tort, specifically fraud, in connection with the performance of the contract. And this is so, H&P posits, because it brought an alternative fraud claim, for which H&P allegedly "presented extensive evidence" at trial (while failing to offer any specifics as to what that evidence was). Yet, it acknowledges that the district court made "no findings" on the fraud claim. We decline to affirm the district court based on a theory for which it made absolutely no findings, and likewise, we refuse to remand for the district court to do so—especially given that the court's rationale for its ruling appears to be easily discernible on the record before us: it erroneously determined that Buchanan and Bollinger were personally liable merely because they were "listed individually as defendants" in the complaint. *See supra* ¶ 18.

## CONCLUSION

¶53 The district court erred in finding that H&P did not learn of the breach of contract until February 7, 2014, and consequently it erred in computing the damages attributable to the outstanding 2,443 shares of Facebook stock. The district court also erred in awarding a refund of the management fee, and it plainly erred in awarding the capital account distribution. Finally, it erred in assessing personal liability against Buchanan and Bollinger.

¶54 Reversed and remanded for further proceedings consistent with this opinion.

————————